OPINION OF THE COURT
 

 Levine, J.
 

 Petitioners are minority stockholders in nine family owned close corporations, each of which had as its sole asset a parcel of income-producing office, commercial or residential real estate in New York City. In 1986, the board of directors and the requisite majority of stockholders of each corporation voted to transfer all of its property to a newly formed partnership. Petitioners voted their shares against the transfers and, pursuant to Business Corporation Law § 623, timely elected to exercise their appraisal rights and receive the "fair value” of their shares in each corporation. When the corporations failed to offer to purchase their shares, petitioners commenced this proceeding to have a judicial determination of the fair value of the shares
 
 {see,
 
 Business Corporation Law § 623 [h]).
 

 In the first phase of a bifurcated valuation trial, Supreme Court determined the net value of the leasehold interest in an office building held by one of the family corporations, a decision not now disputed. The parties then stipulated to the net
 
 *165
 
 asset values of the remaining corporations. It is undisputed that, based on the percentages of each petitioner’s stockholdings in the nine corporations, her proportionate share of the aggregate net asset values of all nine corporations was $15,200,833.
 

 The second phase of the trial was devoted to a determination of the fair value of petitioners’ shares in the nine corporations, given the net asset values previously fixed. At the conclusion of the trial, Supreme Court rejected the testimony of petitioners’ expert, who had essentially arrived at his opinion of fair value by simply applying petitioners’ fractional corporate stock ownership to the aggregate corporate net asset values. The court reasoned that this approach ignored the effect of the lack of marketability of the corporate stock and "valued these shares as if petitioners were co-tenants in the real estate rather than corporate shareholders”.
 

 Instead, Supreme Court adopted the net asset-based valuation methodology employed by Kenneth McGraw, the corporations’ expert. McGraw’s technique was, first, to ascertain what petitioners’ shares hypothetically would sell for, relative to the net asset values of the corporations, if the corporate stocks were marketable and publicly traded; and second, to apply a discount to that hypothetical price per share in order to reflect the stocks’ actual lack of marketability. As to the first step in this valuation process, Supreme Court accepted the comparability of one group of publicly traded shares suggested by Mc-Graw, that is, of real estate investment trusts (REITs). Mc-Graw suggested that REITs shares traded primarily in direct relation to each REIT’s net asset value and, hence, the mean discount between REIT net asset values per share and REIT stock prices (which McGraw found was 9.8%) could be applied to determine what petitioners’ stocks were worth if they were marketable. Thus, McGraw opined that the hypothetical value of the dissenters’ shares here, if marketable and publicly traded, would be 9.8% less than their net asset value per share.
 

 For the second step in McGraw’s valuation process he applied a discount to reflect the illiquidity of petitioners’ shares, i.e., that a potential investor would pay less for shares in a close corporation because they could not readily be liquidated for cash
 
 (see, Matter of Seagroatt Floral Co. [Riccardi],
 
 78 NY2d 439, 445-446). The primary unmarketability discount recommended by McGraw was 30.4%. According to McGraw, that figure represented the mean reduction in price per share when ordinarily publicly traded shares in "compárative” corpora
 
 *166
 
 tians became unregistered and thus, restricted shares, which could only be sold in private placements. The corporations’ expert then exacted an additional 14.6% discount in the value of the shares, which he based upon the existence of restrictions on transfer contained in stockholder agreements covering the shares of all nine corporations.
 

 Although Supreme Court approved of the net asset valuation methodology of the corporations’ expert as a generally valid approach to determining the fair value of petitioners’ shares, it found various flaws in McGraw’s evaluation and modified the values accordingly. First, the court eliminated the initial 9.8% discount from each petitioners’ share in the aggregate net asset value of the corporations. The court based this upon Mc-Graw’s testimonial concession that the discrepancy between net asset value per share and price per share in REITs actually represented for the most part the minority status of the REIT shares traded. Thus, the court reasoned, to reduce petitioners’ share of net asset value by 9.8% would in effect impose a discount based upon petitioners’ status as minority stockholders, a result the court concluded violated New York precedents (citing
 
 Matter of Raskin v Walter Karl, Inc.,
 
 129 AD2d 642;
 
 Matter of Blake v Blake Agency,
 
 107 AD2d 139,
 
 lv denied
 
 65 NY2d 609).
 

 Second, Supreme Court rejected McGraw’s rationale for the imposition of a second unmarketability discount of 14.6% based upon stockholder agreement restrictions, as factually "unpersuasive”. Finally, the court found that McGraw’s 30.4% unmarketability discount actually included "a minority interest factor which is implicit in any minority stock holding”. Consequently, the court considered it necessary to eliminate that factor from the value equation. It did so by reducing the 30.4% discount by 9.4%, which the court regarded as the discount McGraw had testified reflected the minority status of the shares traded in comparable REITs.
 
 [1]
 
 Thus, Supreme Court only applied a 21% discount for unmarketability against each petitioner’s proportionate share of the aggregate net asset value of the corporations, resulting in a fair value determination of each petitioner’s total stock interests of $2,008,682.
 

 The Appellate Division affirmed for the reasons stated by Supreme Court.
 

 
 *167
 
 I
 

 The corporations’ primary argument for reversal is that Supreme Court erred as a matter of law in refusing to take into account in its fair value determination the financial reality that minority shares in a close corporation are worth less because they represent only a minority, rather than a controlling interest. Although the corporations’ argument may have validity when corporate stock is valued for other purposes, it overlooks the statutory objective here of achieving a
 
 fair
 
 appraisal remedy for dissenting minority shareholders. Mandating the imposition of a "minority discount” in fixing the fair value of the stockholdings of dissenting minority shareholders in a close corporation is inconsistent with the equitable principles developed in New York decisional law on dissenting stockholder statutory appraisal rights (a position shared by the courts in most other jurisdictions), and the policies underlying the statutory reforms giving minority stockholders the right to withdraw from a corporation and be compensated for the value of their interests when the corporate majority takes significant action deemed inimical to the position of the minority.
 

 Several principles have emerged from our cases involving appraisal rights of dissenting shareholders under Business Corporation Law § 623 or its predecessor statute. (1) The fair value of a dissenter’s shares is to be determined on their worth in a going concern, not in liquidation, and fair value is not necessarily tied to market value as reflected in actual stock trading (M
 
 atter of Fulton,
 
 257 NY 487, 492). "The purpose of the statute being to save the dissenting stockholder from loss by reason of the change in the nature of the business, he [or she] is entitled to receive the value of his [or her] stock for sale
 
 or its value for
 
 investment”
 
 (id.,
 
 at 494 [emphasis supplied]). (2) The three major elements of fair value are net asset value, investment value and market value. The particular facts and circumstances will dictate which element predominates, and not all three elements must influence the result
 
 (Matter of Endicott Johnson Corp. v Bade,
 
 37 NY2d 585, 587-588). (3) Fair value requires that the dissenting stockholder be paid for his or her
 
 proportionate
 
 interest in a going concern, that is, the intrinsic value of the shareholder’s economic interest in the corporate enterprise
 
 (Matter of Cawley v SCM Corp.,
 
 72 NY2d 465, 474). (4) By virtue of the 1982 amendment to Business Corporation Law § 623 (h) (4) (L 1982, ch 202, § 9), fair value determinations should take into account the subsequent economic impact on value of the very transaction giving rise to
 
 *168
 
 appraisal rights, as supplemental to the three basic value factors (net asset, investment and market values). (5) Determinations of the fair value of a dissenter’s shares are governed by the statutory provisions of the Business Corporation Law that require equal treatment of all shares of the same class of stock
 
 (Matter of Cawley, supra,
 
 at 473).
 

 Further, contrary to the corporations’ contention here, there is no difference in analysis between stock fair value determinations under Business Corporation Law § 623, and fair value determinations under Business Corporation Law § 1118. The latter provision governs the rights of minority stockholders when the corporation has elected to purchase their interests, also at "fair value”, following their petition for corporate dissolution under Business Corporation Law § 1104-a for oppressive majority conduct. The corporations’ opposing argument is that considerations of the oppressive conduct of the majority stockholders enter into fair value considerations conducted under Business Corporation Law § 1118; therefore, the cases decided under that section are distinguishable and not authoritative for fair value considerations under Business Corporation Law § 623. The corporations’ position in this regard is untenable because their basic underlying assumption — that oppressive majority conduct enters into the court’s fair value equation under section 1118 — is in error. As we stated in
 
 Matter of Pace Photographers (Rosen)
 
 (71 NY2d 737), once the corporation has elected to buy the petitioning stockholders’ shares at fair value, "the issue of [majority] wrongdoing [is] superfluous * * * [fjixing blame is material under [Business Corporation Law] § 1104-a, but not under [Business Corporation Law§ ] 1118”
 
 (id.,
 
 at 746;
 
 see also, Matter of Seagroatt Floral Co.,
 
 78 NY2d, at 445,
 
 supra).
 

 Thus, we apply to stock fair value determinations under section 623 the principle we enunciated for such determinations under section 1118 that, in fixing fair value, courts should determine the minority shareholder’s proportionate interest in the going concern value of the corporation as a whole, that is, " 'what a willing purchaser, in an arm’s length transaction, would offer for the
 
 corporation
 
 as an operating business’ ”
 
 (Matter of Pace Photographers [Rosen],
 
 71 NY2d, at 748,
 
 supra,
 
 quoting
 
 Matter of Blake v Blake Agency,
 
 107 AD2d, at 146,
 
 supra
 
 [emphasis supplied]).
 

 Consistent with that approach, we have approved a methodology for fixing the fair value of minority shares in a close corporation under which the investment value of the entire
 
 *169
 
 enterprise was ascertained through a capitalization of earnings (taking into account the unmarketability of the corporate stock) and then fair value was calculated on the basis of the petitioners’ proportionate share of all outstanding corporate stock
 
 (Matter of Seagroatt Floral Co.,
 
 78 NY2d, at 442, 446,
 
 supra).
 

 Imposing a discount for the minority status of the dissenting shares here, as argued by the corporations, would in our view conflict with two central equitable principles of corporate governance we have developed for fair value adjudications of minority shareholder interests under Business Corporation Law §§ 623 and 1118. A minority discount would necessarily deprive minority shareholders of their proportionate interest in a going concern, as guaranteed by our decisions previously discussed. Likewise, imposing a minority discount on the compensation payable to dissenting stockholders for their shares in a proceeding under Business Corporation Law §§ 623 or 1118 would result in minority shares being valued below that of majority shares, thus violating our mandate of equal treatment of all shares of the same class in minority stockholder buyouts.
 

 A minority discount on the value of dissenters’ shares would also significantly undermine one of the major policies behind the appraisal legislation embodied now in Business Corporation Law § 623, the remedial goal of the statute to "protect[ ] minority shareholders 'from being forced to sell at unfair values imposed by those dominating the corporation while allowing the majority to proceed with its desired [corporate action]’ ”
 
 (Matter of Cawley v SCM Corp.,
 
 72 NY2d, at 471,
 
 supra,
 
 quoting
 
 Alpert v 28 William St. Corp.,
 
 61 NY2d 557, 567-568). This protective purpose of the statute prevents the shifting of proportionate economic value of the corporation as a going concern from minority to majority stockholders. As stated by the Delaware Supreme Court, "to fail to accord to a minority shareholder the full proportionate value of his [or her] shares imposes a penalty for lack of control, and unfairly enriches the majority stockholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder”
 
 (Cavalier Oil Corp. v Harnett,
 
 564 A2d 137, 1145 [Del]).
 

 Furthermore, a mandatory reduction in the fair value of minority shares to reflect their owners’ lack of power in the administration of the corporation will inevitably encourage oppressive majority conduct, thereby further driving down the compensation necessary to pay for the value of minority shares.
 
 *170
 
 "Thus, the greater the misconduct by the majority, the less they need to pay for the minority’s shares” (Murdock,
 
 The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Evaluation of Minority Shares,
 
 65 Notre Dame L Rev 425, 487).
 

 We also note that a minority discount has been rejected in a substantial majority of other jurisdictions.
 
 [2]
 
 "Thus, statistically, minority discounts are almost uniformly viewed with disfavor by State courts”
 
 (id.,
 
 at 481). The imposition of a minority discount in derogation of minority stockholder appraisal remedies has been rejected as well by the American Law Institute in its Principles of Corporate Governance
 
 (see,
 
 2 ALI, Principles of Corporate Governance § 7.22, at 314-315; comment
 
 e
 
 to § 7.22, at 324 [1994]).
 

 II
 

 We likewise find no basis to disturb the trial court’s discretion in failing to assign any additional diminution in value of petitioners’ shares here because they were subject to contractual restrictions on voluntary transfer. As we noted in
 
 Matter of Pace Photographers (Rosen) (supra),
 
 a statutory acquisition of minority shares by a corporation pursuant to the Business Corporation Law is not a voluntary sale of corporate shares as contemplated by a restrictive stockholder agreement and, therefore, "the express covenant is literally inapplicable” (71 NY2d, at 749). Nor is there any reason to disturb Supreme Court’s award of prejudgment interest.
 

 III
 

 While we have concluded that Supreme Court correctly applied the legal doctrines respecting fair value determinations of dissenting minority stockholders’ shares in the instant case, we find error in the court’s calculation of the unmarketability discount which must be applied here. As previously explained, Supreme Court generally adopted the net asset valuation approach of McGraw, the corporations’ expert, and his two-step evaluation process. However, the court added back the 9.8% discount McGraw took in the first step of that process
 
 *171
 
 because the court concluded that it actually represented a minority discount. Then, when it reached the second step of the evaluation process, the court removed what it regarded as the same minority discount from the 30.4% unmarketability discount McGraw applied at that stage. Thus, Supreme Court added back McGraw’s minority discount twice, once in each of the stages of the process. Apparently, this was based upon the court’s erroneous finding that McGraw arrived at the 30.4% discount by analyzing privately transacted sales of stock "with restrictive sale provisions and [McGraw] found that they exhibited a median discount of 30.4 percent
 
 relative to net asset
 
 value” (emphasis supplied). Supreme Court further reasoned that, because the sales McGraw analyzed were of minority shares, his unmarketability discount also must have contained an element of reduced value because of their minority status. The evidence in the record does not support the foregoing conclusions. In actuality, McGraw did not arrive at the 30.4% discount by comparing shares with "restrictive sale provisions” to their net asset values. He calculated the unmarketability factor by comparing the purchase prices of registered, publicly traded
 
 minority
 
 shares in comparative corporations, to the purchase prices of
 
 the same class of minority shares
 
 in the same corporations that were unregistered and, therefore, not publicly traded but purchased under trading restrictions in private placements. Because McGraw in his calculations always compared the prices of a marketable set of minority shares to the prices of a set of minority shares when the same stock was unmarketable, the difference in prices of the shares did not contain any additional minority discount element, and the discount was solely attributable to the difference in the marketability of the shares in the same stock.
 

 Thus, Supreme Court erred in removing a nonexistent minority discount element from the reduction in value of petitioners’ shares McGraw attributed to their lack of marketability. It is unclear, however, as to whether Supreme Court would have accepted in full McGraw’s 30.4% discount as a proper reflection of diminution in value due to unmarketability had the court been aware that it did not also reflect a reduction in value due to the shares’ minority status. Because of this uncertainty, the matter must be remitted to Supreme Court for a new determination of the appropriate discount for unmarketability of petitioners’ shares and a recalculation of fair value when that discount is applied to the proportionate net asset value of petitioners’ stockholdings in the nine corporations.
 

 
 *172
 
 Accordingly, the order should be reversed, without costs, and the matter remitted to Supreme Court for further proceedings in accordance with this opinion.
 

 Judges Simons, Titone, Bellacosa, Smith and Ciparick concur; Chief Judge Kaye taking no part.
 

 Order reversed, etc.
 

 [1]
 

 . As earlier described, the actual mean minority discount McGraw derived from his REIT study was 9.8%, not the 9.4% the court applied to reduce McGraw’s recommended unmarketability discount. None of the parties to this appeal has raised any objection based upon this discrepancy.
 

 [2]
 

 .
 
 E.g., Brown v Allied Corrugated Box Co.,
 
 91 Cal App 3d 477, 486, 154 Cal Rptr 170;
 
 Cavalier Oil Corp. v Harnett, supra,
 
 at 1144 (Del);
 
 Hickory Cr. Nursery v Johnston,
 
 167 Ill App 3d 449, 521 NE2d 236, 239-240;
 
 Eyler v Eyler,
 
 492 NE2d 1071 and);
 
 Woodward v Quigley,
 
 257 Iowa 1077, 133 NW2d 38, 43,
 
 mod
 
 257 Iowa 1104, 136 NW2d 280;
 
 Matter of McLoon Oil Co.,
 
 565 A2d 997, 1004-1005 (Me);
 
 Rigel Corp. v Cutchall,
 
 245 Neb 118, 511 NW2d 519.