893 A.2d 1219

EAST PARK LIMITED PARTNERSHIP

v.

Barbara A. LARKIN, et al.

No. 289, Sept. Term, 2005.

Court of Special Appeals of Maryland.

March 6, 2006.

600

James E. Carbine, Baltimore, for appellant.

Robert W. Warfield (Warfield & Darrah, PC, on brief), Severna Park, for appellee.

Panel MURPHY, C.J., SALMON and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, J.

East Park Limited Partnership ("East Park"), the appellant, challenges a judgment of the Circuit Court for Anne Arundel County in favor of four of its former limited partners ("Withdrawing Partners"), the appellees, in a declaratory judgment action. The Withdrawing Partners are Barbara Larkin; Valeere Sass, as Trustee; Rosemary Krupnick; and the Charles L. Helferstay Residuary Trust. They sought a declaration that they properly had exercised a statutory right to withdraw as limited partners and an injunction against a capital call issued by East Park's general partner, Joseph Della Ratta. They also sought payment of the "fair value" of their partnership interests in East Park, pursuant to Md.Code (1975, 1999 Repl.Vol.), section 10–604 of the Corporations & Associations Article ("CA") and, alternatively, a declaration that East Park had been dissolved.

The circuit court ruled that the Withdrawing Partners properly withdrew as limited partners and, on that basis, permanently enjoined the capital call. It also ruled that East Park was dissolved as a matter of law, on account of certain actions of Mr. Della Ratta. On appeal, the Court of Appeals granted *certiorari* on its own initiative before the case was decided in this Court, and reversed the circuit court's order requiring the dissolution of East Park. It affirmed the circuit court's other rulings. *See Della Ratta v. Larkin*, 382 Md. 553, 856 A.2d 643 (2004). The Court vacated the judgment of the circuit court and remanded the case to that court for a determination of the fair value of the Withdrawing Partners' limited partnership interests.

After a two-day trial, the circuit court determined that the collective fair value of the Withdrawing Partners' interests was $3,045,431, and entered judgment in their favor in that

amount. The Withdrawing Partners requested an award of prejudgment interest, which the court denied.

On appeal, East Park presents three questions for review, which we have combined and rephrased:

I. Did the circuit court err by declining to apply lack of control and lack of marketability discounts in determining the fair value of the Withdrawing Partners' partnership interests?

II. Did the circuit court commit reversible error by barring certain testimony of one of East Park's witnesses? [1]

The Withdrawing Partners noted a cross-appeal. They raise the following issue, which we also have rephrased:

III. Did the circuit court err or abuse its discretion by refusing to award prejudgment interest? [2]

For the following reasons, we shall affirm the circuit court's judgment in part, vacate it in part, and remand the case for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

In 1969, East Park was formed under the name "Trinity Joint Venture," for the purpose of developing and owning a

---

**1.** East Park framed the issues as follows:

 "1. What does the statutory term 'fair value' mean as it is employed in the text of [CA section 10–604]?
 "2. Did the Trial Court err by holding that, as a matter of law, no discounts for lack of marketability and lack of control are appropriate?
 "3. Did the Trial Court commit reversible error when it barred testimony as to matters affecting the 'fair value' of the [Withdrawing Partners'] partnership interests in East Park [ ] as of September 29, 2002, because the events took place after the date of valuation?"

**2.** The Withdrawing Partners framed the issue as follows:

 "Whether the trial court erred in failing to award the Withdrawing Partners prejudgment interest on the value of their partnership interests from the date of withdrawal, where after the date of withdrawal, the substantial profits and cash flows attributable to the [Withdrawing Partners'] interests were retained by [East Park] and distributed or allocated to the remaining partners?"

shopping center in northern Anne Arundel County. Mr. Della Ratta was (and is) the sole general partner. The shopping center, named "Park 97," began operations in the mid–1970s. By 2002, it consisted of 205,000 square feet of retail space, and housed tenants such as WalMart, Giant Foods, Fashion Bug, Pizza Hut, and Mobil Oil.

Trinity Joint Venture was reorganized in 1981. At that time, it had thirteen limited partners. In 1992, the name of the partnership was changed to East Park.

In the ensuing years, the makeup of East Park changed. The interests of three of the limited partners were bought out by the other limited partners, and one limited partner's interest was transferred to a family trust.

Four of the limited partners died. Their interests were transferred to their heirs or legatees. In three such cases, the deceased partner's widow became a limited partner, and in one such case, the deceased partner's family trust became a limited partner. These four limited partners are the Withdrawing Partners in the instant case. They hold a 20.797% aggregate interest in East Park.

In 1992, East Park obtained financing from Aegon (USA) Realty Advisors, Inc. ("Aegon"). East Park signed a $9,000,000 promissory note, payable to Aegon, which was secured by a mortgage on Park 97. The note's maturity date was January 1, 2003.

As the maturity date approached, Mr. Della Ratta determined that East Park would not be able to make payment on the note. Instead of refinancing the loan, he decided to issue a capital call, due September 30, 2002. By letter of March 1, 2002, he informed the limited partners that they were to contribute, pro rata, the $7,528,499 balance due on the note. The Withdrawing Partners opposed the capital call. They responded by giving timely written notice of their intention to withdraw from East Park as of September 29, 2002, pursuant to CA section 10–603(b), and demanding that they be paid the "fair value" of their partnership interests, under CA section 10–604.

Mr. Della Ratta denied that the Withdrawing Partners had a right to withdraw, and accelerated the due date of the capital call to September 1, 2002.

On May 28, 2002, in the Circuit Court for Anne Arundel County, the Withdrawing Partners filed the instant suit for declaratory and injunctive relief, and for "fair value." They sought a declaration that they had a statutory right to withdraw, an injunction barring the capital call, and payment of the fair value of their partnership interests. They later amended their complaint to seek dissolution of East Park on the ground that Mr. Della Ratta had transferred his general partnership interest in East Park to a trust for tax avoidance purposes.

The Withdrawing Partners moved for summary judgment on the issues of their statutory right to withdraw and East Park's purported dissolution. They also moved for a preliminary injunction to stay enforcement of the capital call.

On August 30, 2002, the circuit court issued a preliminary injunction, enjoining the capital call until trial. In a separate order issued the same day, it granted partial summary judgment to the Withdrawing Partners, declaring that they had a statutory right to withdraw from East Park, effective September 29, 2002. The court then bifurcated the case into a liability phase and a relief phase.

Trial on liability took place from January 22 to January 24, 2003. On March 28, 2003, the court issued a memorandum opinion and order permanently enjoining the capital call; finding that Mr. Della Ratta had breached his fiduciary duty to the limited partners and had acted in bad faith; and further finding that, because Mr. Della Ratta had transferred his entire general partnership interest into a trust, East Park had no general partner and was thus dissolved as a matter of law. Because the court's earlier ruling about the Withdrawing Partners' right to withdraw was thereby rendered moot, no trial was held on the issue of relief.

East Park appealed the circuit court's decision to this Court. As noted above, before we decided the case, the Court of Appeals granted *certiorari* on its own initiative.

On August 20, 2004, the Court of Appeals filed an opinion holding that the circuit court correctly had determined that the Withdrawing Partners had a statutory right to withdraw, and therefore correctly had enjoined the capital call. The Court further held, however, that East Park was not dissolved as a matter of law, because an anti-assignment clause in the partnership agreement made Mr. Della Ratta's attempted transfer of his interest void from its inception. Accordingly, the Court vacated the judgment of the circuit court and remanded the case for further proceedings. The only issue left pending, then, was the fair value of the Withdrawing Partners' interests in East Park.

On remand, there was a trial on the issue of relief, *i.e.,* "fair value." Both the Withdrawing Partners and East Park presented expert testimony on that topic. One of the Withdrawing Partners' experts, real estate appraiser M. Ronald Lipman, testified that the fair market value of the Park 97 shopping center—the partnership's only asset—was $19,500,000.[3] Another of their experts, William Bavis, C.P.A., testified that, after accounting for East Park's liabilities, its "going concern" value was $14,643,606. He opined that, based on their 20.797% aggregate interest, the fair value of the Withdrawing Partners' collective interest was $3,045,431.

East Park introduced into evidence a Maryland State Department of Assessments and Taxation assessment for the real estate tax year beginning July 1, 2002, valuing Park 97 at $13,895,500. It did not present any expert witness testimony on the issue of the fair market value of Park 97. East Park's expert witness, Joel Charkatz, C.P.A., testified that the fair value of the Withdrawing Partners' interests in East Park was less than the amount testified to by Mr. Bavis, because

---

**3.** The Withdrawing Partners also introduced evidence that Mid–Atlantic Realty Trust was ready, willing, and able to purchase Park 97 for $19.5 million.

discounts should be applied for lack of control and lack of marketability. In particular, Mr. Charkatz testified that, because the Withdrawing Partners hold only a minority interest in East Park, and thus do not have control over management of the partnership, a 25% lack of control discount should apply. He further testified that, because minority interests are undesirable and there is no ready market for the sale of an interest in a limited partnership, a 31.27% lack of marketability discount also should apply.

On March 24, 2005, the court entered separate judgments in favor of the Withdrawing Partners, totaling $3,045,431. In a memorandum opinion, the court explained how it reached its decision. First, it found that the fair market value of Park 97 was $19,500,000. Next, it added to that figure any cash on hand. It then subtracted the partnership's liabilities, which it found to be $4,856,994. That produced $14,643,606, a figure that the court agreed with Mr. Bavis was the net value of East Park as a going concern. The court then turned to the question of the fair value of the Withdrawing Partners' interests. "Fair value" is not defined in CA section 10–604. The court found the phrase ambiguous and looked beyond the plain language of the statute to determine its meaning. It found no useful legislative history, nor any caselaw directly on point.

The court determined that "fair value" is not "fair market value." It considered principles of statutory construction and the language of the Court of Appeals in *Della Ratta, supra,* 382 Md. 553, 856 A.2d 643. In pertinent part, the court wrote:

Had the legislature intended the term "fair value" to mean "fair market value," it would have used the latter term, which is a clearly understood expression defined by countless cases and found throughout the Annotated Code....

The only Maryland appellate decision to discuss [CA section 10–604] is the one in this very case. There, the Court of Appeals stated: "The distribution upon withdrawal referred to in [CA section] 10–604 would be paid by the partnership, not by a third-party purchaser or individual

partners ... Harmonized, [CA sections] 10–603 and 10–604 essentially allow a partner to 'cash out' his or her equity before the partnership terminates." *Della Ratta,* [*supra,*] 382 Md. at 576, 856 A.2d 643. The Court of Appeals drew a distinction between the right to "cash out" under [CA section] 10–604 and other provisions contained in East Park's Partnership Agreement ..., where a partner would receive payment from a third party or from other partners. This language leads to the conclusion that it would be erroneous to view the valuation of a withdrawing partner's interest from the perspective of a third party such as would be done in a fair market value analysis. Instead, the valuation must be viewed from the perspective of the withdrawing partners who are surrendering their interests back to the partnership.

The court went on to consider the term "fair value" as used in CA section 3–202. That statute provides that, in the event of a fundamental corporate change, a dissenting shareholder has the right to withdraw from the corporation, and demand and receive payment of the fair value of his or her stock. Relying on out-of-state cases, the court stated, "Fair value, in the dissenting shareholder context, has been stated to require that the dissenting shareholder be paid for his or her proportionate interest in a going concern, or the intrinsic value of the shareholder's economic interest in the corporate enterprise. The determination should be made by taking the going concern value of the corporation as a whole, as opposed to the value of the individual shares." (Citations omitted.)

The court quoted from one of two Maryland cases that discuss the "fair value" of a dissenting shareholder's stock— *Warren v. Balt. Transit Co.,* 220 Md. 478, 154 A.2d 796 (1959).[4] In that case, the Court of Appeals observed:

The real objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders, that is, to indemnify

---

4. The other Maryland case is *American General Corp. v. Camp,* 171 Md. 629, 190 A. 225 (1937).

him. The textwriters and cases agree generally that this is to be determined by assuming that the corporation will continue as a going concern—not that it is being liquidated—and on this assumption by appraising all material factors and elements that affect value, giving to each the weight indicated by the circumstances, including the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any.

*Id.* at 483, 154 A.2d 796.

In its presentation to the circuit court, East Park had relied on *Warren*, and *Creel v. Lilly*, 354 Md. 77, 729 A.2d 385 (1999), to argue the proposition that fair value does not equal liquidation value, which is essentially the amount at which the court would arrive if it calculated 20.797% of East Park's total value and did not apply any discounts. In *Creel, supra*, the personal representative of a deceased partner's estate sought liquidation of the partnership's assets. The Court of Appeals observed that, under the Uniform Partnership Act, a partnership automatically is dissolved upon the death of a partner unless the partnership agreement provides otherwise. The Court held, however, that the surviving partners could decide to continue the partnership and buy out the deceased partner's interest by paying his estate his proportionate share of the partnership. It further held that, while the estate could demand an accounting as of the date of dissolution, it could not force the partnership to liquidate its assets. Rather, the value of the deceased partner's interest could be calculated from the assets and liabilities of the corporation, and the capital contributions of each of the partners.[5]

---

5. The Court determined that, while the value of the interest might include other intangibles used in calculating the partnership's fair market value, such as goodwill or the value of the partnership as a

Returning to the case at bar, in the circuit court's memorandum opinion, it responded to East Park's liquidation argument, stating, "A liquidation can occur under a variety of scenarios that range from fair market value to a distress sale. However, the term 'liquidation' generally implies that the sale of the entity's assets will net less than if the entity were sold as a going concern." The court continued,

It is true that the *Creel* and *Warren* courts rejected a "liquidation theory" as the basis for valuing a partner's interest. However, [East Park's] argument obscures the facts of this case. It must be remembered that East Park's business consists of nothing more than ownership of the real estate. Unlike a business that loses value when it ceases to operate because of the loss of goodwill or other intangible assets, this particular business has no value other than the value of its underlying fixed assets. Under the facts of this case, there is no distinction between liquidation value and going concern value. The fair value of the partnership interests equal[s] the amount that the partners would receive if East Park sold its sole asset in an arms length transaction.

The court observed that, because the dissenting shareholder statute is meant to protect shareholders from being compelled to participate in a course of conduct they find objectionable, its application is relevant, by analogy, in a case such as this, in which the general partner breached his fiduciary duties to the limited partners and forced them to withdraw in order to avoid an oppressive capital call. Therefore, just as in the dissenting shareholder cases, the fair value of the Withdrawing Partners' interests in this case should equal a proportionate share of the value of East Park as a going concern.

The court also noted that, while the Revised Uniform Partnership Act ("RUPA"), codified at CA section 9A–101, *et seq,* is not directly applicable to this case, it shows the legislature's intent not to apply discounts in determining the value of a

going concern, none applied in that case. *Creel, supra,* 354 Md. at 106–07, 729 A.2d 385.

partnership interest when one withdraws from the partnership.

The court went on to distinguish an Ohio case cited by East Park. It explained that *Conti v. Christoff,* 2001 WL 1199056 (Ohio Ct.App.2001), is unlike the case at bar because, although Ohio has a statute identical to CA section 10–604, the Ohio trial court interpreted "fair value" by looking to another Ohio statute that employs the phrase "fair cash value." Because no Maryland statute includes such a phrase, and because Ohio's definition of fair cash value mirrors the definition of fair market value (which the court had already determined did not equal fair value), the court concluded that the *Conti* case was inapposite.

The court rejected East Park's assertion that lack of control and lack of marketability discounts should apply. It took into account that, in dissenting shareholder cases, the majority of states do not apply those discounts in determining fair value. The court observed that the Withdrawing Partners' interests would not be sold on the open market. It stated, "If the discounts were applied, the remaining partners would end up acquiring the interests of the withdrawing partners for less than they were worth if those interests had remained in the hands of the withdrawing partners." The Court concluded that, *"under the circumstances of this case,* it is not appropriate to apply such discounts in order to determine the value of the interests of the withdrawing partners under [CA section] 10–604." (Emphasis in original.) It therefore awarded the Withdrawing Partners the fair market value of East Park multiplied by their percentage interest (20.797%), or $3,045,431.[6]

Finally, the court turned to the Withdrawing Partners' request for prejudgment interest. It observed that, generally,

---

6. The court entered four separate judgments against East Park: $1,789,200 in favor of Barbara Larkin; $556,091 in favor of Valeere Sass; $466,765 in favor of the Charles L. Helferstay Trust; and $233,375 in favor of Rosemary Krupnick. The judgments total $3,045,431.

the decision whether to award prejudgment interest is discretionary. Prejudgment interest will be awarded as a matter of right, however, when "an obligation to pay is certain, definite and liquidated by a specific date prior to judgment so that the withholding of payment deprives the creditor of the use of the money." The court found that the value of the Withdrawing Partners' interests was not ascertainable before trial and, because CA section 10–604 does not specifically provide for prejudgment interest, the Withdrawing Partners were not entitled to it.

After judgment was entered, on April 13, 2005, the parties executed a "Stipulation, Agreement and Consent Regarding Judgment," in which East Park agreed that the fair value of the Withdrawing Partners' interest was at least $969,022 (resulting from use of the assessed value of Park 97 and application of lack of marketability and minority discounts); and that it would pay that amount, plus interest from the date of judgment, to the Withdrawing Partners.

We shall include additional facts as necessary to our discussion of the issues.

## STATUTORY FRAMEWORK

In Maryland, prior to 1981, the Uniform Partnership Act ("UPA") governed all partnerships, whether general or limited, when no partnership agreement was in place. CA § 9–101 *et seq.* In 1981, the General Assembly enacted the Revised Uniform Limited Partnership Act ("RULPA"), which took effect in 1982. *See* 1981 Md. Laws, ch. 801 (codified at CA § 10–101 *et seq.*). The provisions of the UPA still applied to limited partnerships, unless inconsistent with or modified by the RULPA. CA § 10–108.

In 1997, the General Assembly enacted the RUPA, which was phased in so as to completely replace the UPA as of January 1, 2003. 1997 Md. Laws, ch. 654.[7]

---

7. In 2001, the Commissioners on Uniform State Laws promulgated a new version of the ULPA, which has not been adopted in Maryland.

The law that governs this case is the UPA, unless inconsistent with or modified by the RULPA. *Della Ratta, supra,* 382 Md. at 568, 856 A.2d 643. Because only the RULPA addresses the right of a limited partner to withdraw from the partnership and receive "fair value" for his or her partnership interest, it is only that law with which we are directly concerned.

Specifically, the RULPA provides, at CA section 10–603(b): A limited partner may withdraw on not less than 6 months' prior written notice to each general partner at the general partner's address on the books of the limited partnership if the following conditions are met:

(1) The limited partnership was formed before October 1, 1998;

(2) On October 1, 1998, the partnership agreement of the limited partnership did not specify in writing the time or the events on the occurrence of which a limited partner may withdraw or a definite time for the dissolution and the winding up of the limited partnership; and

(3) The limited partnership did not amend its partnership agreement on or after October 1, 1998 to specify in writing the time or the events on the occurrence of which a limited partner may withdraw or a definite time for the dissolution and winding up of the limited partnership.

The RULPA further provides, at CA section 10–604:

Except as otherwise provided in this subtitle, on withdrawal any withdrawing partner is entitled to receive any distribution to which the partner is entitled under the partnership agreement and, if not otherwise provided in the partnership agreement, *the partner is entitled to receive, within a reasonable time after withdrawal, the fair value of the partner's partnership interest in the limited partnership as of the date of withdrawal,* based on the partner's right to share in distributions from the limited partnership.

(Emphasis added.)

"Fair value" is not defined in the RULPA, and no Maryland case addresses the meaning of the phrase in the context of limited partnerships. The only direct guidance on the subject

is the observation of the Court of Appeals *in this case,* that "[h]armonized, [CA sections] 10–603 and 10–604 essentially allow a partner to 'cash out' his or her equity before the partnership terminates." *Della Ratta, supra,* 382 Md. at 576, 856 A.2d 643.

The phrase "fair value" appears in three sections of the Corporations and Associations Article that concern dissenting shareholders. *See* CA §§ 2–602, 3–106, 3–202. As noted above, when a corporation undergoes certain fundamental change, a dissenting shareholder who meets certain requirements has the right to receive the "fair value" of his or her shares. The Maryland appellate courts have not considered whether discounts should be applied in dissenting shareholder cases. The majority of states that have considered the issue have concluded that discounts do not apply. *See Lawson Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 401, 734 A.2d 738 (1999) (observing that "equitable considerations have led the majority of states and commentators to conclude that marketability and minority discounts should not be applied when determining the fair value of dissenting shareholders' stock"); *Friedman v. Beway Realty Corp.,* 87 N.Y.2d 161, 170, 638 N.Y.S.2d 399, 661 N.E.2d 972 (1995) (noting that "a minority discount has been rejected in a substantial majority of other jurisdictions"); *see also* 2 AMERICAN LAW INSTITUTE, PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.22(a) (1994 & Supp.2005) (stating that fair value "should be the value of the [dissenting shareholders'] proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability"); MODEL BUS. CORP. ACT § 13.01(4) (2003) (stating that "fair value means the value of the corporation's shares determined ... without discounting for lack of marketability or minority status").

Finally, the RUPA, which does not apply to this case but may provide some guidance, states that when a partner is "dissociated" from a partnership,

[t]he buyout price of [his or her] interest is the amount that would have been distributable to the dissociating partner

... if, on the date of dissociation, the assets of the partnership were sold at a price equal to the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner and the partnership were wound up as of that date.

CA § 9A–701(b).

## DISCUSSION

### I.

East Park's principal contention on appeal is that the circuit court erred as a matter of law in calculating the fair value of the Withdrawing Partners' interests by multiplying the fair market value of East Park by their percentage interests. It argues that the court essentially "liquidated East Park on paper," contrary to the Maryland caselaw holding that partnership interests should be valued as though the partnership were a going concern. While East Park does not argue that the circuit court should have used a fair market value analysis in valuing the Withdrawing Partners' interests, it argues that the court should have applied the minority and marketability discounts that are pertinent to a fair market value analysis.

East Park further maintains that the dissenting shareholder cases offer a poor analogy to this case because corporation law, unlike partnership law, allows shareholders to receive the fair value of their shares only when the corporation undergoes a fundamental change. Limited partners, on the other hand, may withdraw at any time, provided they meet the requirements of CA section 10–603. East Park argues, "This fundamental disconnection between [CA] Section 10–604 and the purpose of Objecting Stockholder Statutes, makes the philosophical underpinning for the statutory phrase 'fair value' different for each."

The Withdrawing Partners respond that the circuit court did not liquidate East Park on paper; rather, it valued the partnership as a going concern, and then awarded the Withdrawing Partners their pro-rata share of that total. They argue that fair value does not mean fair market value and that

the dissenting shareholder cases are the most relevant authority on the subject of fair value. They maintain that the purpose of CA section 10–603 is the same as that of the dissenting shareholder statutes—to protect individuals from being forced to engage in a course of conduct they find objectionable—and that, in both situations, the entity is purchasing the interest of the individuals. For the same reasons discounts are not appropriate in those cases, they are not appropriate here.

The Withdrawing Partners point out that, while the RUPA does not govern the case at bar, it is noteworthy nonetheless that it does not allow for discounts when a partner dissociates. They maintain that the RUPA "reflects the legislature's current view of how to fairly determine the price to be paid a withdrawing partner," and this is relevant to the meaning of fair value in CA section 10–604.

The Withdrawing Partners further respond that the circuit court did not refuse to apply discounts as a matter of law, but determined that, under the facts of this case, discounts were not appropriate. They argue, "A proper reading of [the circuit court's opinion] is that [the court] considered the application of discounts, reviewed the appellate decisions from other jurisdictions, and found those decisions that did not favor the application of discounts in cases such as this to be persuasive." Because the court considered the dissenting shareholder cases from other states, the RUPA, and the expert testimony on fair value, its decision was supported by competent and material evidence.

 We agree with the Withdrawing Partners that the "fair value" of a limited partner's interest is a question of fact to be decided by the trier of fact. The phrase is not defined in the Maryland Code, and the session laws note that "the determination of the fair value of the withdrawing partner's interest may be difficult." 1981 Md. Laws, ch. 801. Discounts should be considered, but not necessarily applied, in arriving at fair value. Had the General Assembly used the phrase "fair market value," which appears throughout the Code and is

a well-defined concept, we might hold otherwise. We think, however, that the legislature used "fair value" in order to leave particular valuation decisions, such as the application of discounts, up to the courts. Our conclusion is in line with Maryland's dissenting shareholder cases holding that the method used in determining the fair value of shares is specific to each case. *See Warren, supra,* 220 Md. 478, 154 A.2d 796; *Am. Gen. Corp., supra,* 171 Md. 629, 190 A. 225. Therefore, we shall review the circuit court's valuation decision for clear error. *Liberty Mut. Ins. Co.,* 154 Md.App. 604, 609, 841 A.2d 46 (2004).

■ The circuit court's fair value finding was supported by competent and material evidence and, therefore, was not clearly erroneous. *See Cannon v. Cannon,* 156 Md.App. 387, 404, 846 A.2d 1127, *aff'd,* 384 Md. 537, 865 A.2d 563 (2005) (explaining clearly erroneous standard). Expert testimony, which the court credited, established that the fair market value of Park 97, East Park's only asset, was $19,500,000; the going concern value of East Park was $14,643,606; and the aggregate fair value of the Withdrawing Partners' interests was $3,045,431. East Park did not present any expert witness testimony on the fair market value of Park 97. Further, the circuit court apparently did not find the testimony of East Park's expert, Mr. Charkatz, to be persuasive on the question of fair value. Mr. Charkatz testified that he was not familiar with CA section 10–604, and essentially equated fair value with fair market value.

Mr. Bavis's testimony as to fair value, which the circuit court adopted, is supported by the caselaw on the question of fair value, which we shall now discuss.

■ First, although we agree with East Park that the partnership entity should be valued as a going concern, *see Warren, supra,* 220 Md. at 483, 154 A.2d 796, we do not agree that the circuit court failed to do this and improperly "liquidated East Park on paper." When a partnership is liquidated, or "wound up," its assets are sold, its debts are paid, and any surplus is distributed to the partners in proportion to their

partnership interests. *See* CA § 9A–807. The partners do not receive the value of certain assets, including future income potential, that they might have received had the partnership entity been sold as a going concern. In some cases, however, the partnership's liquidation value and its going concern value may be exactly the same.

In this case, East Park has but one partnership asset—the Park 97 shopping center. The going concern value thus was based solely on the fair market value of Park 97, and the partnership's cash and liabilities. Because the shopping center could continue to produce income even in a liquidation, East Park's going concern value and its liquidation value might be the same.

While East Park relies heavily upon *Creel, supra,* 354 Md. 77, 729 A.2d 385, that case does not mandate that a partner who withdraws from an ongoing partnership may never receive the same distribution he would have had the partnership been liquidated. It simply holds that, when a partner leaves, he may not demand that the partnership actually be liquidated. In fact, in *Creel,* the representative of the deceased partner's estate received approximately what she would have received had a liquidation occurred, because the partnership did not possess any intangible assets. Although East Park argues that the circuit court in this case improperly liquidated the partnership on paper, it fails to appreciate that, just as in *Creel,* East Park's going concern value did not differ from its liquidation value. While the Withdrawing Partners may have received the same amount of money they would have received in a liquidation of East Park, that does not mean that they did not receive the value of their interests in East Park as a going concern.

■ Second, East Park's arguments in favor of discounting the partnership interests are not persuasive. As the Court of Appeals observed in this very case, CA sections 10–603 and 10–604 allow a limited partner to "cash out" his or her equity in the partnership before the partnership terminates. The payment upon withdrawal under CA section 10–604 "would be

paid by the partnership, not by a third-party purchaser or individual partners." *Della Ratta, supra,* 382 Md. at 576, 856 A.2d 643. In other words, CA section 10–604 contemplates that a withdrawing partner's interest will not be sold on the open market but rather will be absorbed by the partnership entity.

The dissenting shareholder cases from states that do not apply discounts for minority and lack of marketability recognize this distinction. For instance, the Montana Supreme Court has explained that

> [a]pplying a discount is inappropriate when the shareholder is selling her shares to a majority shareholder or to the corporation. The sale differs from a sale to a third party and, thus, different interests must be recognized. When selling to a third party, the value of the shares is either the same as or less than it was in the hands of the transferor because the third party gains no right to control or manage the corporation. However, a sale to a majority shareholder or to the corporation simply consolidates or increases the interests of those already in control. Therefore, requiring the application of a minority discount when selling to an "insider" would result in a windfall to the transferee.

*Hansen v. 75 Ranch Co.,* 288 Mont. 310, 325, 957 P.2d 32 (1998). *See also Arnaud v. Stockgrowers State Bank of Ashland,* 268 Kan. 163, 169–70, 992 P.2d 216 (1999) (holding that minority and marketability discounts do not apply when the purchaser is the corporation or a majority shareholder); *Brown v. Allied Corrugated Box Co.,* 91 Cal.App.3d 477, 485–86, 154 Cal.Rptr. 170 (1979) (same).

Furthermore, courts have recognized that "[t]he application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a 'going concern,' " *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1145 (Del.1989), and that "the application of a minority discount . . . deprives minority shareholders of their proportionate interest in a going concern." *Pueblo Bancorporation v. Lindoe, Inc.,* 37 P.3d 492, 496 (Colo.App.2001) (citing *Friedman, supra,* 87

N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972). This is so because the individuals are not receiving what they would have received had the entire entity been sold on the open market. Instead, they are receiving what they would have received had only *their* interests been sold, which is not what actually occurs. The Supreme Judicial Court of Maine observed:

> The valuation focus under the appraisal statute is not the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole. The question for the court becomes simple and direct: What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety? The court then prorates that value for the whole firm equally among all shares of its common stock.

*In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1004 (Me.1989).

We disagree with East Park's position that the dissenting shareholder cases offer a poor analogy to the withdrawal of a limited partner. That shareholders may withdraw only under certain circumstances, but limited partners may withdraw at any time, makes no difference in our analysis. In both situations, the individuals are exercising a statutory right to withdraw from an entity, and the entity is absorbing the interests of those individuals. *See* CA §§ 3–202, 10–604. Had the legislature intended to place restrictions on a limited partner's right to withdraw, it could have. The Withdrawing Partners should not be penalized for exercising their statutory rights.

East Park's argument is particularly unpersuasive given the facts of this case, *i.e.*, that the Withdrawing Partner's withdrew from the partnership because of Mr. Della Ratta's breach of fiduciary duties. As the circuit court explained, "[t]he aim of . . . the Dissenting Shareholder Statute is similar to [CA section] 10–604[,] that is, to 'cash out' the interests of the dissenting shareholders in order to avoid compelling the shareholders to participate in a corporate course they find

objectionable. In the case at bar, [CA section] 10–604 has been invoked by [the Withdrawing Partners] for the same purpose."

The reasoning employed in dissenting shareholder cases is on point. The application of discounts is appropriate only under a fair market value analysis, that is, in determining what price a willing buyer would offer, and a willing seller would accept, on the open market. *See, e.g., Bern–Shaw Ltd. P'ship v. Mayor & City Council of Baltimore*, 377 Md. 277, 302–03, 833 A.2d 502 (2003). Here, the application of discounts would unjustly enrich the remaining partners of East Park because they would receive the distributions attributable to the Withdrawing Partners' interests; yet, as the circuit court aptly pointed out, "the remaining partners would end up acquiring the interest of the withdrawing partners for less than they were worth if those interests had remained in the hands of the withdrawing partners."

█ Because no open market transaction takes place when a partner withdraws from a limited partnership, we hold that, ordinarily, discounts should not be applied. We also note that, under the RUPA, discounts should not be used. Accordingly, the circuit court did not err in its determination of the fair value of the Withdrawing Partners' interests in East Park.

## II.

█ East Park also contends that the circuit court committed reversible error when it barred Mr. Della Ratta's testimony about events that took place after the September 29, 2002 valuation date. Its attorney proffered that Mr. Della Ratta would have testified that Anne Arundel County would not agree to East Park's proposed realignment of East Park Drive, which is near Park 97; that WalMart had informed him that it intended to "go dark," meaning that it was going to vacate the premises but continue paying rent; and that percentage rent figures for certain other tenants, including Giant and Pizza Hut, were either flat or declining.

East Park argues that, although the Withdrawing Partners' interests were to be valued as of the date of withdrawal, Mr. Della Ratta's testimony on these points was relevant because it would discredit the Withdrawing Partners' experts' opinions about the value of East Park. It also argues that the Withdrawing Partners opened the door to this testimony by taking the position that the application of discounts would create a windfall to East Park. In other words, they "created a situation in which the finder of fact became entitled to know whether there are actual reasons in the real world why the predicted 'windfall' might not be so certain to occur."

The Withdrawing Partners counter that "fair market value [of Park 97] is determined making reasonable assumptions based on facts known as of the valuation date and that facts and events that subsequently occur have no bearing on the fair market value as of the valuation date." They argue that because East Park has not shown that the court's rejection of the proffered testimony was "manifestly wrong" and "substantially injurious," the court did not abuse its discretion. Furthermore, the proffered testimony regarding the County's and WalMart's intentions was inadmissible hearsay.

The testimony proffered by East Park as to events that occurred after September 29, 2002, was not independently relevant, as CA section 10–604 expressly states that fair value is to be determined "as of the date of withdrawal." *See* Md. Rule 5–401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact *that is of consequence to the determination of the action* more or less probable than it would be without the evidence") (emphasis added). The only potential relevance the testimony had was as impeachment evidence.

The Maryland Rules allow a party to attack the credibility of a witness by the use of "extrinsic evidence contradicting a witness's testimony." Rule 5–616. In the instant case, East Park could have introduced evidence tending to show that Mr. Lipman's and Mr. Bavis's opinions were not credible, *based on the facts that reasonably could have been known to them as of*

*the date of valuation.* East Park could not, however, attempt to contradict their testimony by introducing facts that were not known by anyone until after that date. *See Okerlund v. United States,* 365 F.3d 1044, 1051–52 (Fed.Cir.2004) (finding no error in district court refusing to admit evidence that expert's valuation prediction turned out to be wrong). While East Park was free to point out that a lease provision allowed WalMart to "go dark," it could not introduce evidence that, after the valuation date, someone from WalMart had stated that the store intended to "go dark."

Expert opinions as to valuation are not always correct; they are merely reasonable predictions based on certain assumptions. That those predictions may one day be proved wrong does not mean that they were unreasonable at the time they were made. *See Ithaca Trust Co. v. United States,* 279 U.S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647 (1929) ("[Value] depends largely on more or less certain prophecies of the future; and the value is no less real at that time if later the prophecy turns out false than when it comes out true.")

Furthermore, the Withdrawing Partners did not open the door to admission of evidence of subsequent events by taking the position that the remaining partners might receive a windfall; East Park could rebut that position only by showing why, *on the date of valuation,* the remaining partners would not receive a windfall. Accordingly, the circuit court did not abuse its discretion in refusing to admit the proffered testimony. *See Tuer v. McDonald,* 112 Md.App. 121, 136, 684 A.2d 478 (1996), *aff'd,* 347 Md. 507, 701 A.2d 1101 (1997) (circuit court's exclusion of evidence based on lack of relevancy reviewed for abuse of discretion).

## III.

In their cross-appeal, the Withdrawing Partners contend that the court improperly denied their request for prejudgment interest. They argue that, while the allowance of prejudgment interest usually is left to the discretion of the trier of fact, "prejudgment interest may be recovered as a matter of

right where the money has actually been used by the other party." They assert that, because East Park retained all cash flow and profits that were directly attributable to their partnership interests during the litigation, their "financial interests were used by [East Park] for monetary gain," and therefore they were entitled to prejudgment interest as a matter of right.

Alternatively, the Withdrawing Partners argue that the circuit court abused its discretion in refusing to award prejudgment interest, because it was inequitable to allow East Park to retain all cash flow and profits while simultaneously delaying payment of fair value beyond a reasonable time after withdrawal. Furthermore, the circumstances surrounding their withdrawal, including Mr. Della Ratta's breach of fiduciary duties, weigh in favor of an award of prejudgment interest.

In response, East Park argues that prejudgment interest is available as a matter of right only "when the obligation is fixed and certain." In this case, the fair value of the Withdrawing Partners' interests was uncertain until the day of the judgment. Moreover, East Park previously had attempted to pay the Withdrawing Partners what it believed to be the fair value of their interests, and the Withdrawing Partners had refused to accept that amount. Therefore, their role in prolonging the litigation weighs against an award of prejudgment interest, and the court did not abuse its discretion.

The Court of Appeals discussed prejudgment interest in *Ver Brycke v. Ver Brycke*, 379 Md. 669, 843 A.2d 758 (2004). It stated:

The intermediate appellate court correctly observed that pre-judgment interest as a matter of right is the exception rather than the rule, *see Buxton v. Buxton*, 363 Md. 634, 770 A.2d 152 (2001), and that " '[w]hether a party is entitled to pre-judgment interest generally is left to the discretion of the fact finder.' " *Ver Brycke*, 150 Md.App. [623,] 656, 822 A.2d [1226,] 1246 [2003] (citing *I.W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 24, 344 A.2d 65, 79 (1975)). As we explained in *Buxton*, "[p]re-judgment interest is

allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'" 363 Md. at 656, 770 A.2d at 165 [quoting *First Virginia Bank v. Settles*, 322 Md. 555, 564, 588 A.2d 803 (1991)].

*Id.* at 702–03, 843 A.2d 758. The Court also has stated that prejudgment interest "compensates the judgment creditor for *his or her* inability to use the funds that should have been in his or her hands at some earlier time and usually does not depend on what the debtor might have done with the money." *Buxton, supra,* 363 Md. at 652, 770 A.2d 152 (emphasis in original).

■ Here, the fair value of the Withdrawing Partners' interests was disputed, to some extent, until the circuit court's judgment was entered. A portion of that judgment has been undisputed for a significant period of time, however. As we shall explain, the Withdrawing Partners were entitled to an award of prejudgment interest on that amount.

East Park's initial position that the Withdrawing Partners did not have a statutory right to withdraw no longer had any merit once the Court of Appeals held that they did. At that point, the payment of fair value was mandated by CA section 10–604, and East Park had to concede that it owed the Withdrawing Partners at least *some* amount for their interests. In its trial brief, East Park asked the circuit court to find that the value of the partnership entity was $13,895,500, based on the assessed value of Park 97; that a lack of marketability discount of 25% and a minority discount of 31.27% should be applied to the Withdrawing Partners' interests; and that the fair value of the Withdrawing Partners' interests was $969,022. Thus, East Park did not dispute that it owed the Withdrawing Partners at least $969,022. Throughout the circuit court proceedings, East Park maintained that it owed that amount, and that is the amount that it

already has paid to the Withdrawing Partners pursuant to the "Stipulation, Agreement and Consent Regarding Judgment."

Because the obligation to pay at least $969,022 was "certain, definite, and liquidated" from the time the case was remanded by the Court of Appeals, the Withdrawing Partners were entitled to prejudgment interest on that portion of the judgment for that period of time. *See Ver Brycke, supra,* 379 Md. at 702, 843 A.2d 758. This result is sound, given that CA section 10–604 requires that fair value be paid "within a reasonable time after withdrawal" and, even though East Park conceded it owed at least $969,022, it did not pay the Withdrawing Partners that amount until after judgment was entered, approximately 2 and one-half years after the date of withdrawal. The Withdrawing Partners should be compensated for the loss of use of those funds during that time. *See Buxton, supra,* 363 Md. at 652, 770 A.2d 152.

Furthermore, other states have awarded prejudgment interest on only a portion of a judgment when that portion has been undisputed throughout the litigation. *See, e.g., N. Indiana Pub. Serv. Co. v. Stokes,* 595 N.E.2d 275 (Ind.App. 1992); *State Farm Mut. Auto. Ins. Co. v. Reeder,* 763 S.W.2d 116 (Ky.1988); *Friedman v. Alliance Ins. Co.,* 240 Kan. 229, 729 P.2d 1160 (1986). *See also All West Pet Supply Co. v. Hill's Pet Products Div., Colgate–Palmolive Co.,* 842 F.Supp. 1376, 1379 (D.Kan.1994) (holding that prejudgment interest began to run on date defendant admitted in a court filing that it owed a portion of the amount sought by plaintiff).

With respect to the disputed portion of the judgment— $2,076,409—we hold that the circuit court did not abuse its discretion in declining to award prejudgment interest. Because the fair value of the Withdrawing Partners' interests was a question of fact involving complex principles of valuation, the amount of the obligation was not certain until the date of judgment. Although the Withdrawing Partners argue that they are entitled to prejudgment interest as a matter of right because East Park "used" the money they were owed, that exception applies only when a fixed amount has been

used. *See Charles County Broadcasting Co. v. Meares,* 270 Md. 321, 332, 311 A.2d 27 (1973) (upholding award of prejudgment interest when one party used $40,000 deposit for corporate purposes).

We shall remand this case to the circuit court for computation of prejudgment interest on the undisputed amount— $969,022—from the date of the Court of Appeals's mandate in this case through March 25, 2005.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLANT.