*Maryland Indoor Play, LLC, et al. v. Snowden Investment LLC*, No. 29, September Term, 2024. Opinion by Gould, J.

**CONTRACTS – BREACH OF INVESTMENT RIGHT – MEASURE OF DAMAGES**

The Supreme Court of Maryland held that the proper measure of damages for a breach of an investor's right to purchase a membership interest in a limited liability company is general damages, measured on the date of the breach and calculated using the fair market value of the interest at the time of breach, minus the price the investor would have paid for the interest.

**CONTRACTS – BREACH OF INVESTMENT RIGHT – SPECIFIC PERFORMANCE**

The Supreme Court of Maryland held that specific performance was not an appropriate remedy where the circuit court, lacking sufficient evidence on which to make its findings, failed to consider all relevant facts and circumstances in determining the appropriate terms under which an investor, years after the breach of its investment right, would have become a member on equal terms as the other members and also failed to find that the investor was ready, willing, and able to satisfy those terms.

Circuit Court for Howard County
Case No.: C-13-CV-21-000193
Argued: February 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 29

September Term, 2024

_____

MARYLAND INDOOR PLAY, LLC, et al.

v.

SNOWDEN INVESTMENT LLC

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Gould, J.

_____

Filed: July 1, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case requires us to determine the appropriate remedies when a party breaches a contractual right to notice of an opportunity to invest in a company at its inception. Here, the investor was denied that right with respect to two separate companies. The circuit court awarded specific performance as to one and compensatory damages as to the other. For the former, we must determine whether specific performance was available in the absence of evidence that the investor was ready, willing, and able to invest on the same terms and conditions as the founders. As to the latter, the issue is whether the court applied the correct measure of damages. On both issues, we find that the circuit court erred.

**I**

**A**

The business at issue here is a children's indoor play facility called Hyper Kidz. This concept was developed by Maryland Indoor Play, LLC ("MIP"), which was formed on November 4, 2016. Its original members were two limited liability companies that each owned a 50% interest in MIP. The two LLCs were Reed/Clark Enterprises, LLC, whose members were Bynia Reed and David Clark (then married),[1] and Srinergy2 Educare, L.L.C. ("Srinergy2"), whose members were Chinnababu and Sangeetha Gudapati (also married).

MIP's first Hyper Kidz location opened in February 2018 in Columbia, Maryland. Before that occurred, however, MIP ran into financial difficulties getting the location ready

---

[1] In 2019, Ms. Reed and Mr. Clark began divorce proceedings. In December 2019, Ms. Reed dissolved Reed/Clark and assumed a 50% ownership interest in MIP. The circuit court held that Ms. Reed released Mr. Clark from any liability related to Reed/Clark. That holding has not been challenged, and Mr. Clark is not a party here.

to open. MIP's landlord was supposed to fund MIP's tenant improvements, but the landlord filed for bankruptcy before disbursing the funds. MIP needed money to pay its contractors and tide it over until the new landlord could release the funds. In November 2017, Mr. Gudapati approached his friend, Ashish Parikh, and requested a loan.

Mr. Parikh told Mr. Gudapati that the business looked promising and that he wanted to be a partner, not a lender. He also told Mr. Gudapati that they "should be opening multiple locations." To that, Mr. Gudapati responded: "[Y]eah, we intend to do that if we go successful on this."

Ultimately, the discussions between Mr. Parikh and Mr. Gudapati culminated in a loan. In connection with the loan, Mr. Parikh formed Snowden Investment LLC ("Snowden") along with three other members, each of whom funded Snowden with $90,000.

**B**

On January 12, 2018, Snowden loaned MIP $350,000. The loan was documented by a Loan and Security Agreement (the "Loan Agreement") and a Term Note (the "Note") and was secured by a personal guaranty (the "Guaranty") from Mr. Clark, Ms. Reed, Mr. Gudapati, and Ms. Gudapati (collectively, the "Guarantors"). The Note required repayment of the principal over four years.

Section 6.5 of the Loan Agreement provided Snowden with the right to invest in future related ventures:

> If at any time while the LOAN and NOTE are outstanding or thirty-six months thereafter, the BORROWER [MIP] and/or the GUARANTORS seek to open additional locations of an organization related to operating or

2

owning an indoor play entertainment facility for children, including, but not limited to Hyper Kidz, prior to issuing any equity interests or taking any loans in connection with the creation, construction, operation or financing of the venture, whether it be through the BORROWER, any of the GUARANTORS or any other entity (collectively, the "NEW VENTURE"), the LENDER [Snowden] shall be provided at least sixty (60) days prior written notice of the NEW VENTURE and an opportunity to elect to obtain equity interests in the NEW VENTURE or loan the NEW VENTURE working capital funds on the same terms as the other equity holders and/or lenders of the NEW VENTURE, as the case may be. The LENDER shall have sixty (60) days upon recei[pt] of notice of the NEW VENTURE to elect to participate by providing the BORROWER and/or GUARANTORS notice, as the case may be.

We pause for a brief comment on the nature of this provision. The parties and the courts referred to the right granted under section 6.5 as a right of first refusal, or ROFR for shorthand. We have doubts that section 6.5 is a ROFR as that term is commonly understood or used. We view section 6.5 as providing Snowden with an option to participate in new ventures, so instead of using the terms "right of first refusal" or "ROFR" to describe Snowden's rights under section 6.5, we will use the term "Investment Right."

## C

In May 2018, Ms. Reed and Srinergy2 formed Boomerang Franchise LLC ("Boomerang") to franchise the Hyper Kidz business concept. Contrary to the requirements of section 6.5, Snowden was not given written notice of the formation of Boomerang.

## D

On October 28, 2018, Ms. Reed and Srinergy2 formed Ashburn Indoor Play LLC ("Ashburn") to open a Hyper Kidz location in Ashburn, Virginia. Membership interests in Ashburn were issued that same day to Ms. Reed and Srinergy2. Although Ashburn executed a lease in January 2019, it did not open for business until August 2021. Contrary

3

to the requirements of section 6.5, Snowden was not given written notice of the formation of Ashburn.

## II

## A

Snowden filed an eight-count complaint against MIP, Bynia Reed, Chinnababu Gudapati, and Sangeetha Gudapati (collectively, the "Founders"), and David Clark in March 2021, just shy of three years after both Boomerang and Ashburn were formed. Count One requested a declaratory judgment that sought to clarify Snowden's Investment Right, including whether it applied to Boomerang. Among other things, Snowden asked the court to declare:

> C) The Right of First Refusal set forth in Section 6.5 of the Loan and Security Agreement dated January 12, 2018 between Snowden Investment LLC ("Snowden") and Maryland Indoor Play, LLC requires Defendants Maryland Indoor Play, LLC, Bynia Reed, David Clark, Chinnababu Gudapati and Sangeetha Gudapati to offer Snowden an equity interest in all Hyper Kidz or indoor play locations (franchise and non-franchise) or entities involved in the creation of Hyper Kidz or indoor play locations during the term of the loan and thirty-six (36) months thereafter, including but not limited to Boomerang, LLC, on the exact same terms offered to Defendants and/or any entity created by Defendants, including but not limited to Boomerang, LLC; and

> D) Defendants Maryland Indoor Play, LLC, Bynia Reed, David Clark[], Chinnababu Gudapati and Sangeetha Gudapati shall (1) immediately provide Snowden Investment LLC with the exact same terms of their interest, or the interest of any entity owned by them, in any Hyper Kidz or indoor play location or franchise opportunity, (2) allow Snowden Investment LLC sixty (60) days to exercise its right to participate in the venture on equal terms as Defendants as required by Section 6.5 of the Agreement, and (3) pay to Snowden Investment LLC all past due equity payments due and owing to Snowden Investment LLC with interest according to the rates in the Promissory Note arising out of any Hyper Kidz or indoor play operation or entity involved in the creation of such operations for which Snowden

4

Investment LLC elects an equity interest. Such payments shall be calculated as of the date on which Defendants or their entities first obtained an equity interest in said operation or entity . . . of the equity interest[.]

Count Two requested compensatory damages for any breach of Snowden's Investment Right as to Boomerang, Ashburn, and certain other locations, mostly in Maryland and Virginia. Ultimately, Snowden narrowed that count to Boomerang and Ashburn.

Count Eight sought to hold the Guarantors liable under the Guaranty for all damages awarded under the other counts. Snowden also sought attorneys' fees under applicable provisions of the Loan Agreement and Note. The remaining counts are not relevant here.

**B**

In June 2022, the circuit court granted Snowden's summary judgment motion on its declaratory judgment count (Count One). But in doing so, it did not declare the parties' rights under section 6.5; it simply granted summary judgment with no elaboration. The court also granted summary judgment to Snowden, on liability only on its breach of contract count (Count Two) as to Boomerang and Ashburn, leaving damages to be determined at trial.[2]

**C**

Trial began on July 26, 2022. That morning, the court granted the Founders' motion to preclude Snowden's damages expert, Robert Rosenthal, "from testifying as to any

---

[2] The other rulings and clarifications to those rulings are not relevant here.

opinions or introducing his own work product as to any damages and expert opinion as to damages for Boomerang Franchise LLC[.]"

Mr. Rosenthal was, however, permitted to opine on Snowden's damages as to Ashburn. Mr. Rosenthal testified that:

- In commercial cases, there are two measures of damages: lost profits and lost value.
- The lost value approach measures the value that a plaintiff would have received but for the breach.
- There are three ways to measure lost value: (1) cost, (2) income, and (3) market.
- The income approach uses a discounted cash flow analysis or a capitalization method.
- He used the income approach to measure lost value.
- That method takes the projected revenues minus the projected expenses and then "you bring that back to present value at a discount rate."
- His objective was to determine the "position that the Plaintiff would have been back in the spring of 2021."
- The Ashburn location opened in August 2021, and so he projected out the "future revenue and expenses" and then discounted it back to "March of '21" "to arrive at a conclusion of what that value was for the 1/3 interest that [Snowden] would have had."
- There is no set rule on how far out one goes in projecting revenues and expenses, but there needs to be some way to account for the assumption that "the business just doesn't disappear."
- One way to do that is to "determine what we call a terminal value . . . then combine what we call the discreet period which is the projection period with the terminal value to arrive at the value of the company at that point in time."

Mr. Rosenthal opined why this was the appropriate method to calculate value:

Because you have a business that hadn't started operations yet. And you're trying to value an asset which is . . . the right of first refusal. The right of first refusal is based upon what's the value of that right of first refusal. Well, it's based upon the value of the business that is expected to be built into the future. In that methodology the discounted cash flow method is the method that gets you to that value.

6

Mr. Rosenthal valued Ashburn—the entire business—at $1,470,000. He opined that a one-third interest in that business "would be the value of the right of first refusal." And then he subtracted from that "the partner capital," which he determined to be $110,000. Thus, he opined, the "net value of the founder's investment opportunity or the right of first refusal divided by three it gets you the $453,333 number."

Mr. Rosenthal acknowledged that Snowden's interest would have given it no control over the business. Thus, he explained, discounts for lack of marketability and lack of control would be appropriately used if one is measuring "fair market value." But he contended that, "[i]f the standard of value is fair value which is what I was asked to do, there aren't any of those. The discounts are not applied." He went on to explain that fair value is used in Maryland and elsewhere in "dissenting shareholder actions or squeeze-out situations." Thus, "in [his] view that's akin" to the breach of the "right of first refusal" in this case.

Mr. Rosenthal valued the one-third interest in Ashburn as of March 31, 2021. That date, he said, was when he "determined that [Snowden] was to be given the opportunity to exercise the right of first refusal." Mr. Rosenthal acknowledged, however, that one witness testified that the equity interests were issued when Ashburn was formed, in October 2018. Nevertheless, on redirect, Snowden's counsel coaxed out of Mr. Rosenthal his agreement that the date of his valuation, March 31, 2021, could "be considered the date of breach." Mr. Rosenthal admitted that a multi-year difference in valuation dates could yield materially different valuations. When asked "when you do your valuation, does your valuation really alter depending on the date of the breach?" Mr. Rosenthal answered, "If

7

it's within a few months of that date it's not going to be—you wouldn't expect there to be a material change. If it's a year or two afterwards or beforehand there would be a different number perhaps."

## D

After receiving post-trial briefing, the court issued a Memorandum Opinion and accompanying order resolving each claim. The only decisions relevant here are the declaratory judgment (Count One) and the breach of the Investment Right (Count Two).

The trial judge recognized that the court had previously granted summary judgment to Snowden on June 13, 2022. The court noted that under Count One, Snowden sought specific performance: "to be provided with an equity interest in both Ashburn and Boomerang." The court acknowledged that Snowden had to show that it was ready and able to perform. The court determined that Snowden met that burden because: (1) it had filed the instant lawsuit seeking specific performance; (2) it had no other business liabilities; and (3) the Founders had paid Snowden $141,219.12 in loan and net profit payments as of January 2019 and $393,842 by November 2019—amounts far exceeding the Founders' capital contributions to acquire interest in Ashburn (not Boomerang).

The court ordered that "within ten (10) days of the entry of this Order, Defendants shall grant to Plaintiff its Right of First Refusal with respect to Boomerang Franchise LLC as set forth in § 6.5 of the parties' Agreement[.]"

On Count Two, the circuit court awarded Snowden $453,333.00 for the breach of contract regarding Ashburn, adopting Snowden's expert's fair value methodology. The court rejected the Founders' argument that Mr. Rosenthal used an incorrect measure of

8

damages, finding that the use of fair value instead of fair market value was permissible under *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387 (2012). In doing so, the court characterized Snowden's claimed damages as consequential damages for "lost business profits and opportunities." In reliance on *CR-RSC Tower I*, 429 Md. at 410, the court rejected the Founders' contention that damages must be measured at the time of breach.

**E**

The Founders timely noted their appeal and raised multiple arguments before the Appellate Court of Maryland, *Md. Indoor Play, LLC v. Snowden Inv. LLC*, Nos. 683 & 2307, Sept. Term 2023, 2024 WL 3384983, at *4-18 (Md. App. Ct. July 12, 2024), only a subset of which are relevant here.

The Appellate Court rejected the Founders' argument that specific performance was improper in the absence of evidence that Snowden was ready, willing, and able to comply with the terms and conditions for being admitted as a member of Boomerang. *Id.* at *6-7.

The court also rejected the Founders' challenge to the damages award of $453,333 for the breach of the Investment Right as to Ashburn. *Id.* at *12-13. Specifically, the court rejected the Founders' argument that Mr. Rosenthal was required to measure damages as of the time of the breach. *Id.* at *9-10. The court also rejected the Founders' argument that Mr. Rosenthal improperly used a "fair value" measure of value instead of "fair market value." *Id.* at *11-12.

9

This Court granted the Founders' petition for a writ of certiorari, *Md. Indoor Play, LLC v. Snowden Inv. LLC*, 489 Md. 195 (2024), on the following questions:

1. Did the Appellate Court of Maryland expand the right of first refusal by holding that a breach thereof can be established without proof that the buyer is ready, willing, and able to act thereon?

2. Did the Appellate Court of Maryland create and apply a new measure of general damages for breach of contract by allowing the non-breaching party to recover damages measured by the "fair value" as determined years after the alleged breach occurred?

**III**

**A**

Pursuant to Maryland Rule 8-131(c), when reviewing a case tried without a jury, this Court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *White v. Pines Cmty. Improvement Ass'n, Inc.*, 403 Md. 13, 30 (2008). However, we give no deference to a lower court's interpretation and application of Maryland law. *Id.* at 31. The proper measure of damages is a question of law that we review de novo. *CR-RSC Tower I*, 429 Md. at 422 (explaining that "a trial court's rulings on the admission of evidence are discretionary, so long as the correct rule of law is applied").

The grant of specific performance is reviewed for abuse of discretion. *See Excel Co., Inc. v. Freeman*, 252 Md. 242, 246 (1969). An appellate court will not reverse for abuse of discretion "simply because the appellate court would not have made the same

ruling." *Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 425 (2007) (quoting *North v. North*, 102 Md. App. 1, 14 (1994)). An abuse of discretion occurs if the court declines to exercise its discretion or neglects to consider the relevant factors in exercising it. *101 Geneva LLC v. Wynn*, 435 Md. 233, 241-42 (2013).

**B**

The purpose of contract damages is to place the non-breaching party in the position it would have occupied had the contract not been breached. *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244, 268 (2018). Such expectation damages are measured by: "(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." *CR-RSC Tower I*, 429 Md. at 407 (quoting *David Sloane, Inc. v. Stanley G. House & Assocs. Inc.*, 311 Md. 36, 42 (1987)).

As this formulation reflects, Maryland law recognizes two categories of damages, and how damages are calculated depends on which category is claimed. *Id.* at 407. A claim for the "value of the other party's performance" is one for direct losses, or general damages, measured as "the difference between the contract price and the fair market value at the time of breach." *Id.* (quoting *Burson v. Simard*, 424 Md. 318, 327 (2012)). Consequential damages are "calculated as losses that 'may reasonably be supposed to have been in the contemplation of both parties at the time of making of the contract.'" *Id.* at 408 (quoting *Burson*, 424 Md. at 327).

11

To illustrate the difference, take, for example, a contract between a paint supplier and a painting contractor. The supplier breaches the contract to deliver paint to the job site at the specified date and time. The contractor must find a replacement supplier on short notice and pay $1,000 more than it would have paid under the supply contract. The contractor suffers $1,000 in general damages, measured on the date of the breach. *See id.* at 412-13.

Now suppose that because of the supplier's breach, the painting contractor loses the job. The profits the contractor would have made on that job—that is, the "lost profits"—would be recoverable—if such losses were reasonably within the contemplation of the parties when they signed the contract—as consequential damages. *See id.*

Now take the example a step further. Suppose the job the contractor lost was a three-month job. The contractor has enough experience to know how much labor would be needed and what that labor would cost and, therefore, could accurately forecast the expected profits on the job. But suppose that after the breach, the labor market undergoes a cataclysmic change due to labor strikes among painters and other trades, thus doubling the cost of the labor beyond that which the contractor anticipated spending. So, as it turns out, one might say the contractor should be thankful that the supplier breached the contract because the job would have produced a loss instead of a profit.

The evidentiary issue presented in that scenario is whether the actual post-market conditions should be admissible when the contractor sues for breach of contract. The contractor would seek lost profits based on the market conditions when the supplier breached the contract. That is, the contractor would rely on its projected profits. The

contractor would argue that the date of breach is the relevant date for measuring damages, and thus, evidence of the post-market labor strikes and their effect on the actual labor costs should be excluded. The supplier would counter that if the goal were to ascertain the truth— that is, what the contractor actually would have made or lost on the job—then the actual labor costs should be admissible.

That's the type of case this Court faced in *CR-RSC Tower I*. Only there, instead of a simple paint supply contract, the contracts at issue were sophisticated ground leases under which the tenants planned to develop the land and construct and then operate two high-rise apartment buildings. *CR-RSC Tower I*, 429 Md. at 398-99. And instead of a failure to supply paint, the breach was the landlords' failure to deliver unqualified estoppel certificates—confirming that the tenants were not in breach of the ground leases—to the tenants' lender. *Id.* at 400. So why all the fuss over the failure to deliver an estoppel certificate? To the rest of us, those estoppel certificates would not be worth the paper they are written on. But not so to the tenants; that breach stopped the project dead in its tracks because the lender was not willing to risk loaning more than $80 million to tenants who were allegedly in breach of their ground leases before the first shovel went into the ground. *Id.*

The tenants sued the landlords seeking the profits they would have made but for the landlords' refusal to issue the estoppel certificates. *Id.* at 398. The circuit court determined that the landlords breached their contractual duty to furnish the estoppel certificates. *Id.* at 401. The tenants proved their lost profits with an expert who relied on the tenants' and their lender's detailed market analyses and projections before the landlords' breach. *Id.* at 407.

13

As it turns out, however, had the tenants been able to move forward with the project, they would have been building into the teeth of the cataclysmic collapse of the real estate market in 2009 and 2010. *Id.* The landlords sought to admit evidence of that market collapse to discredit the tenants' lost profit calculations. *Id.* at 405. The circuit court excluded such evidence. *Id.* at 403. The jury awarded the tenant damages of $36,350,239.00. *Id.*

The issue before this Court, among others not relevant here, was whether the circuit court properly excluded the landlords' evidence of the post-breach market collapse. *Id.* at 404-06. The tenants argued that damages in contract cases are measured at the date of breach, and thus, the post-breach market conditions were inadmissible. *Id.* at 406. That is, the tenants were advocating for a "'time of breach' rule across the board, to every kind of damages claim." *Id.* at 410. The landlords, on the other hand, argued that the lost profit damages sought by the tenants were "consequential damages, measurable at a later day."[3] *Id.* at 413. And thus, they argued, evidence of post-breach market conditions was essential to test whether the tenants proved their lost profits with "reasonable certainty." *Id.* We were faced with two proposed bright-line rules which, if adopted, would have dictated the answer to the evidentiary question before us.

Our analysis began with the basic understanding that Maryland continues to recognize the two forms of damages: direct (general) and consequential. *Id.* at 407-11. We declined to adopt the tenants' bright line "time of breach" rule for all damages cases

---

[3] Both the circuit court and Snowden contended that this Court held that consequential damages "are measurable at a later day[]" than the breach. This is flatly incorrect. That's merely how we described the theory presented to us by the landlords. *CR-RSC Tower I*, 429 Md. at 413.

14

because, although that rule applies for measuring general damages, it does not apply for consequential damages. *Id.* at 410-11. We therefore cautioned against "blithely" applying the "time of breach" rule "to lost profit cases involving a business's anticipated income[,]" and explained that "[t]he nature of the evidence offered to prove lost profits must be examined carefully." *Id.* at 411.

We then examined the tenants' evidence to determine which category applied but quickly discovered that their expert's analysis was not so easy to pigeon-hole. *Id.* at 411-13. The expert spoke of lost profits, which the law generally recognizes as consequential damages. *See id.* at 411 (quoting 3 Dan B. Dobbs, *Law of Remedies* § 12.4(3) (2d ed. 1993)). But on the other hand, the expert "sought to establish how to value the ground lease that Landlords[] refused to perform[,]" *id.* at 411, which seemed to speak the language of general damages, *id.* at 408 (providing that lost profits based on the value of the item promised are general damages measured by "the difference between the contract price and the fair market value at the time of breach" (quoting *Burson*, 424 Md. at 327)). And we observed that the contemplated project was not like a turn-key sale of an income-producing commercial property or business that lends itself to standard value calculations using multipliers or capitalization rates. *Id.* at 411-13. Rather, "[t]his was a complex undertaking requiring Tenants' expertise as developers[,]" so we could not say "that the testimony reflected that the ground lease itself was equal in value to the 10-year income stream." *Id.* at 413. Thus, we concluded that the tenants' claimed damages "should not be strictly categorized either as general or consequential." *Id.* We proceeded to test the landlords'

15

theory that the claimed damages were, indeed, "consequential damages, measurable at a later day." *Id.*

That analysis turned out poorly for the landlords. We reviewed and found wanting the cases the landlords offered in support of their proposition that post-breach market evidence was admissible to prove consequential lost profits. *Id.* at 413-17. We stated: "Indeed, we know of no Maryland cases in which such evidence was admitted for that purpose, and out-of-state cases provide no general rule either." *Id.* at 416-17 (footnotes omitted). And in the absence of case law to guide us, we went back to the basics, concluding that: "[T]he core question for consequential damages is whether they were in the contemplation of the parties when they contracted." *Id.* at 417.

From there, the evidentiary analysis was straightforward. The case law, we determined, "instruct[ed] us that consequential lost profits are calculated with reference to what the parties can reasonably be said to have anticipated when they entered into the contract." *Id.* at 418. We further found that there was no evidence that the parties contemplated the "cataclysmic" market downturn that happened post-breach, and thus the circuit court properly exercised its discretion in excluding such evidence. *Id.* at 421-22.

Here, on appeal, Snowden argues that Mr. Rosenthal's damages calculation fell into the consequential damages bucket and thus could be measured *after* the breach. To do so, Snowden makes much of our caution against "blithely" applying the "time of breach" rule and the difficulties we had in "strictly" categorizing the tenants' claimed damages as either general or consequential. *See CR-RSC Tower I*, 429 Md. at 411-13. According to Snowden, these statements gave courts flexibility to decide whether damages were general or

16

consequential and how damages should be measured. That is an incorrect reading of *CR-RSC Tower I*.

When we cautioned against blithely applying the "time of breach" rule, we were merely rejecting the bright line rule that the tenants advocated for all breach of contract cases. *Id.* at 407-11. We were not inviting litigants and courts to set aside the "time of breach" rule when it applied, and to that end, we never wavered from the principle that general damages *are* measured at the time of breach. *Id.* And our reluctance in *CR-RSC Tower I* to "strictly" categorize the tenants' damages as general or consequential was not an invitation for litigants and courts to ignore the fundamental distinctions between general and consequential damages or to disregard the importance of determining in which bucket the claimed lost profit damages belong. It was merely a recognition that, sometimes, the distinction is hard to make, and given that difficulty, we were able to resolve the evidentiary question by returning our focus to the nature of the evidence excluded and whether such events were reasonably contemplated by the parties at the time of contracting. *Id.* at 411-23. Thus, we analyzed the evidentiary issue under the consequential damages framework, which required us to determine what the parties expected at the time of contracting, not at some later date.

This case presents none of the difficulties we encountered in *CR-RSC Tower I*. Here, the Investment Right gave Snowden the right, not the obligation, to purchase a membership interest in Ashburn in October 2018. And MIP's breach of Snowden's Investment Right prevented Snowden from purchasing that membership interest. The breaches here were not like the breach of the paint supply contract that prevented the contractor from completing

a job, nor like the failure to deliver estoppel certificates that prevented the tenants in *CR-RSC Tower I* from moving forward with their project. That Snowden was denied the opportunity to acquire the membership interest in Ashburn did not prevent Snowden from operating a business or investing in some other venture. Even Snowden's expert used a "value" approach to damages, not the consequential lost profits approach. Snowden's claimed damages belong in the general damages category, and thus, the rule governing general damages should have been applied. The circuit court erred in finding otherwise.[4]

---

[4] It warrants noting that on July 19, 2022, one week before trial, Snowden moved to exclude the Founders' expert, James Kern, from testifying on damages because, Snowden argued, Mr. Kern did *not* measure the damages as general damages:

> Under Maryland law the fundamental principal of computing contract damages is that the court should "attempt to put the injured party in a good as position as it would have occupied had the contract been fully performed by the breaching party." *WSC/2005 LLC v. Trio Ventures Associates*, 460 Md. 244, 269 (2018) (citing *Beard v. S/E Joint Venture*, 321 Md. 126, 133 (1990)). That is, contract damages are intended to restore the non-breaching party's expectation interest. *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 407 (2012). Damages "are calculated with reference to what the parties can reasonably be said to have anticipated when they entered into the contract." *Id.* at 418. The traditional rule is that expectancy, and therefore damages, is measured at the time of the breach. *Republic Ins. Co. v. Prince George's County*, 92 Md.[ ]App. 528, 533 (1992) (citation and internal quotations omitted); *see also Beard*, 321 Md. at 141 (1990) ("[a]s we have seen, the ordinary rule for computing loss of the bargain damages is to value the property at the time of breach"). Even if characterized as a form of lost profits, when profits refer to the increase in value of an item promised, a claim for breach of contract is for "general damages" — "the difference between the contract price and the fair market value at the time of breach." *CR-RSC Tower I, LLC*, 429 Md. at 408 (citation omitted). Value is determined at the time of breach. *Id.* at 409 (collecting cases).
>
> Mr. Kern provides no opinion or testimony as to the value of the first right of refusal in acquiring equity in Ashburn when Defendants breached the

## C

General damages are properly measured by the fair market value of the interest: the "price a willing buyer would offer, and a willing seller would accept, on the open market." *East Park Ltd. P'ship v. Larkin*, 167 Md. App. 599, 621 (2006). Thus, for Ashburn, damages should have been calculated based on the fair value of the interest Snowden would have acquired, valued on the date of the breach, minus the price Snowden would have paid to acquire it. In other words, fair market value is the price at which Snowden could have sold its minority interest in Ashburn to a willing third-party buyer, not to Ashburn or its controlling members. *See id.* at 619.

Snowden maintains that Mr. Rosenthal properly measured damages by using "fair value" instead of "fair market value." This is not a dispute over semantics. Minority interests in privately-held companies are difficult to sell because there is no ready market, and such interests usually come with no say in how the business is run. Thus, a minority interest will usually sell to a third-party for less than its share of the proceeds if the

---

Agreement. When asked if he valued "the business expectation that would have existed when plaintiff had the right to exercise the first right of refusal," Mr. Kern stated "[n]o, I did not do a value as of some date prior to December 31st, 2021, when you're saying the person would have had that option, so to speak." *Id.* at 44:4-11. Rather, he agreed that his "testimony is that the value of the first right of refusal is based on the current value of the business," and that this value would be constantly changing. *Id.* at 42:8-14.

Apparently, sometime between that filing and the first day of trial, July 26, 2022, Snowden had a change of heart. And although it was entitled to change its position, its statement on July 19, 2022, long after Mr. Rosenthal completed his analysis, strongly suggests that Snowden intended that Mr. Rosenthal would measure damages under the general damages framework.

company were sold for market price. *See id.* at 617-19. To reflect that economic reality, valuation experts usually apply a marketability discount and a control discount to assess the fair market value of a minority interest. *Id.* at 621. But no discounts are applied when measuring fair value. *Id.* at 616-17.

The Appellate Court determined, however, that in this situation, using fair value would be a more accurate way to measure damages. *Md. Indoor Play*, 2024 WL 3384983, at *11-12. According to the court, the statutory remedy for dissenting stockholders provided an analogous framework for measuring damages. *Id.* The court reasoned that if dissenting stockholders are compensated for their interests at fair value, then Snowden, who was denied the opportunity to invest in the first place, should be similarly compensated. *Id.* at *12.

This is not the appropriate case for us to explore and determine the full nature and scope of Maryland law on dissenting stockholders. For present purposes, it is sufficient to state that, as a general matter, stockholders in corporations enjoy statutory dissenting rights when the corporation takes certain major actions. MD. CODE ANN., CORPS. & ASS'NS ("CA") § 3-202 (2014 Repl. Vol.); *see also East Park*, 167 Md. App. at 614. Because the statute sets the price at fair value, discounts are not applied. *East Park*, 167 Md. App. at 620-21. This prevents the corporation and its remaining stockholders from enjoying a windfall at the dissenters' expense. *Id.* at 621-22.

An example to illustrate this point may help. Suppose a corporation (OldCo) with 13 stockholders owns a piece of income-producing real estate worth $10 million. The board of directors of OldCo is comprised of three of the stockholders who collectively own 90%

20

of the outstanding shares, with the remaining 10 stockholders owning 10%. The board members form another corporation (NewCo) with only the three board members as the stockholders, and then cause NewCo to contract to purchase the property from OldCo for $5 million. A classic squeeze-out.

This prompts the 10 minority stockholders to invoke their dissenting rights. OldCo must, therefore, buy the dissenters' stock at fair value, without discounts. This remedy does *not* put the dissenters back in the position they had occupied before the squeeze-out—minority stockholders with no right to second-guess the good faith exercise of the directors' business judgment on whether to sell the company's property and at what price. Instead, this remedy put the minority stockholders in the position they would have enjoyed had the property been sold at its market price, not the steeply discounted price orchestrated by the three self-interested directors. In doing so, this remedy prevents the board of directors from retaining the benefits of their squeeze-out play. That is, it's a remedy for unjust enrichment, *id.* at 621, which focuses on the gains to the defendant, not the losses to the plaintiff, *Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 40 (2023) (citing *Mogavero v. Silverstein*, 142 Md. App. 259, 276 (2002)).

Contract damages serve a different purpose: to vindicate the non-breaching parties' expectation interests. *See WSC/2005*, 460 Md. at 268. Under Snowden's theory of the case, had there been no breach, it would be holding a minority interest in Ashburn—an interest that, if sold to a third party, would be subject to marketability and lack of control discounts. Expectation damages, therefore, must reflect that reality. *See id.*

And conversely, had there been no breach, Snowden would have acquired a minority interest, and as a minority member, it would have enjoyed *no* expectation or right to be bought out by the Founders or anyone else at any price, let alone at fair value. Thus, compensating Snowden based on a fair value would put it in a *better* position than it would have reasonably expected but for the breach of its Investment Right. That, of course, is not the purpose of contract damages. That's why contract damages are based on the fair market value, not fair value.

**D**

Snowden's damages calculation was legally deficient for another reason: Mr. Rosenthal measured the damages not at the date of breach, but almost three years later. The burden of proof for each element of Snowden's breach of contract claim, including damages, rested with Snowden. *See Collins/Snoops Assocs., Inc. v. CJF, LLC*, 190 Md. App. 146, 161 (2010); *Brock Bridge Ltd. P'ship, Inc. v. Dev. Facilitators, Inc.*, 114 Md. App. 144, 157 (1997). But Snowden never established the date of the breach; in fact, it appears that Snowden took no position on when the breach occurred, choosing instead to argue that the date of the breach was irrelevant because it was seeking consequential damages. And, as a result, Snowden failed to prove a key element of its breach of contract claim.

In contrast, once the trial began, the Founders did take a position on when the breach occurred. In their motion for judgment at the close of Snowden's case, they argued that the critical date was the date the equity interests were issued and that, at the latest, the breach

22

had occurred by then. They took the same position during closing arguments and again in their post-trial memorandum.

We agree with the Founders. Under the plain language of section 6.5, Snowden was entitled to written notice *before* the equity interests were issued. Equity in Ashburn was issued on October 24, 2018. That was the date by which Snowden had the right to invest in Ashburn, and therefore, that was the proper date for measuring of damages.

The Appellate Court concluded otherwise, relying primarily on the fact that the Founders' expert, James Kern, chose a valuation date even further removed from the breach date than that of Mr. Rosenthal. *Md. Indoor Play*, 2024 WL 3384983, at *10-11. To that extent, the court perceived Mr. Kern's analysis as providing the trial court with an additional evidentiary basis to determine that the proper valuation date was years after the breach. *Id.* Thus, the court concluded that the Founders were hard-pressed to complain that the trial court effectively agreed with them that damages could be measured as of a later date. *Id.* at *11.

We disagree with this reasoning. The correct measure of damages is an issue of law. *CR-RSC Tower I*, 429 Md. at 422. And although a party may waive an error of law by failing to object, *see, e.g.*, *CSX Transp., Inc. v. Continental Ins. Co.*, 343 Md. 216, 240 (1996), the Founders did no such thing. Rather, as noted above, at trial, they consistently argued that Mr. Rosenthal used the wrong date for measuring value. They never waived that issue.

And because they never waived that issue, that Mr. Kern used an even later date than Mr. Rosenthal means only that Mr. Kern's opinion was based on the same wrong

measure as Mr. Rosenthal's.[5] Only that did not matter to the Founders because they did not have the burden of proof on damages. Mr. Kern's use of the wrong measure meant only that his testimony was legally irrelevant.[6] That Mr. Rosenthal used the wrong measure was far more consequential because it meant that Snowden failed to prove compensatory damages.

E

We turn now to the issue of specific performance. The circuit court's order required the Founders to "grant to [Snowden] its Right of First Refusal with respect to Boomerang Franchise LLC as set forth in § 6.5 of the parties' Agreement[.]" The Founders argued before the Appellate Court, among other things, that specific performance was not available as a matter of law because Snowden failed to establish that it was ready, willing, and able to invest in and comply with the same terms and conditions as have the existing equity holders of Boomerang. *Md. Indoor Play*, 2024 WL 3384983, at *4. The Appellate Court rejected that argument, holding that the only performance required of Snowden was to "be

---

[5] We did not see in the record an explanation for Mr. Kern's valuation date, but we assume it was a strategic decision related to the rebuttal nature of Mr. Rosenthal's testimony.

[6] When the Founders opposed Snowden's motion in limine to exclude Mr. Kern's testimony based on Snowden's contention that Mr. Kern failed to use the date of breach to measure damages, they contended that the court had not yet established the date of breach and acknowledged that it may turn out, once the court established the date of breach, that both experts' testimony would be inadmissible. Ultimately, the court made no finding on the date of breach, presumably because it determined that Snowden's damages fell in the consequential damages bucket.

24

available to receive the notice and offer." *Id.* at \*7. Snowden makes that same argument before this Court. We disagree.

**1**

Specific performance is an extraordinary remedy for breach of contract. *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 308 n.8 (2015). The party seeking specific performance has the burden of proving its entitlement to such relief. *See Finkelstein v. Miller*, 239 Md. 512, 516 (1965).

Snowden requested specific performance in its count for declaratory judgment (Count One). A declaratory judgment is available when:

> it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:
>
> > (1) An actual controversy exists between contending parties;
> >
> > (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or
> >
> > (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

MD. CODE ANN., CTS. & JUD. PROC. ("CJ") § 3-409(a) (2020 Repl. Vol.).

Thus, the purpose of the Declaratory Judgment Act, CJ §§ 3-401 to 3-415, is to provide a mechanism for parties to fully and finally settle their disputes. *Id.* § 3-402; *see also Harford Mut. Ins. Co. v. Woodfin Equities Corp.*, 344 Md. 399, 414-15 (1997). The statute authorizes the court to grant ancillary relief along with the court's declaration of the parties' rights. CJ § 3-412(a) ("Further relief based on a declaratory judgment or decree may be granted if necessary or proper."). Such relief should be fashioned with an eye

25

towards *terminating* the controversy, not sowing the seeds for further litigation. *See id.* §§ 3-402, 3-412.

Although Snowden requested a declaratory judgment and ancillary relief in Count One, it sought compensatory damages for the *same* breaches of contract in Count Two. Requesting alternative remedies in a complaint is permissible. *City of Balt. v. Landay*, 258 Md. 568, 580 (1970). Eventually, though, a party must choose; the court cannot grant specific performance *and* compensatory damages for the same breach. *Id.* Here, after Snowden was awarded summary judgment, Snowden represented in the amended joint pretrial statement filed one week before trial that the only issue remaining as to Boomerang and Ashburn was compensatory damages and attorneys' fees. Snowden further represented its intent to call Mr. Rosenthal to opine on such damages. So as the trial date approached, Snowden was seeking damages for the denial of the opportunity to invest in Boomerang and Ashburn, not for the lack of notice.

Before trial, however, the Founders moved to preclude Mr. Rosenthal from opining on damages regarding Boomerang because his opinion had not been timely disclosed. The court granted that motion on the first morning of trial over Snowden's vehement objection. So, having been denied the ability to prove damages from the lost investment opportunity, Snowden had to pivot to an alternative remedy: specific performance.

But as a remedy to what breach? The breach of Snowden's right to the administrative act of notice so that it could mull over whether to invest in Boomerang? To ask the question is to answer it. What we said almost 80 years ago about the remedy of specific performance is still true:

26

It has been broadly stated that the extraordinary remedy of specific performance is not a matter of right in either party, but is a matter of discretion in the court. This discretion, however, is not an arbitrary or capricious discretion, but a sound and reasonable discretion, which is governed as far as possible by established principles of equity, and which grants or withholds relief according to the circumstances of each particular case when the established principles do not furnish any exact measure of justice between the parties. If a contract for the sale of real estate is in writing, and is clear, definite, mutual, and equitable, the chancellor must grant the complainant's application if it is within the law. He may refuse relief only when the facts are doubtful, or when some of the terms of the contract are so vague or uncertain that injustice might arise.

*Barranco v. Kostens*, 189 Md. 94, 97 (1947).

This case, of course, is not about the enforcement of a contract for the purchase and sale of real estate where the terms and conditions are usually spelled out with specificity. Rather, this case is about Snowden's right to become a full partner in a business that, at the time of judgment, had been operating for at least four years. That does not automatically render a specific performance remedy off limits, but it surely complicates the court's task.

**2**

The Appellate Court was persuaded that the relief awarded was appropriate because it aligned with the relief Snowden requested in the complaint, and thus the only performance necessary of Snowden was to sit back and receive the written notice required under section 6.5. *Md. Indoor Play*, 2024 WL 3384983, at *7. We disagree: The appropriate time for that remedy had long since passed.

If Snowden had learned about Boomerang days or weeks after its formation and immediately filed suit for declaratory judgment to enforce its right to notice, such bare relief would have been appropriate. In that scenario, upon receipt of the court-ordered

27

notice, Snowden would have had the opportunity, but not the obligation, to invest in Boomerang on the ground floor. The Investment Right was intended to afford Snowden the right to invest at the beginning, when its prospects for success were speculative and uncertain, not to take a "wait and see" approach while the other members did the work, bore the risk, and weathered the COVID-19 pandemic.

When the case went to trial, Boomerang had been in business for over four years. To grant specific performance at that stage, the court had to, as close as reasonably possible, attempt to put Snowden in the position it would have been had it been a member of Boomerang since the beginning. At a minimum, that means ascertaining not just the initial capital contributions, but any additional ones. And once it determined all the terms and conditions for Snowden to be admitted on equal footing as the other members, the court needed to determine whether Snowden was ready, willing, and able to pay its full share as an equal member and satisfy any applicable non-monetary conditions.

The Appellate Court acknowledged but rejected the Founders' argument that there were "numerous terms that Snowden would have to satisfy as an equity member of Boomerang[.]" *Md. Indoor Play*, 2024 WL 3384983, at *6. The court determined that the Founders' record citations in support of that argument referred to terms of membership of Ashburn or MIP, and thus observed that "[n]o evidence was submitted indicating the terms of membership in Boomerang." *Id.* The court also said that the Founders "successfully convinced the court to exclude financial evidence related to Boomerang" and thus "deprived Snowden the opportunity to demonstrate that it could comply with the terms of membership." *Id.* at *7.

28

These reasons miss the point: As the party seeking specific performance, Snowden had the burden of proof. *Finkelstein*, 239 Md. at 516. If the trial court excluded evidence Snowden needed to satisfy that burden, Snowden could have challenged those evidentiary rulings on appeal. But it did not.

In any event, we are not aware of any such evidentiary rulings. It appears the Appellate Court was referring to the order granting the Founders' motion in limine precluding Snowden's expert, Mr. Rosenthal, from opining on Snowden's damages as to Boomerang. That order merely precluded Mr. Rosenthal's opinion on damages because it was untimely disclosed; it did not exclude evidence relevant to its specific performance request, especially evidence the Founders produced in discovery.

Through discovery, Snowden obtained Boomerang's Operating Agreement— indeed, it was an exhibit to Snowden's successful summary judgment motion. The operating agreement addressed, among other things: (1) the members' obligations to make initial and subsequent capital contributions; (2) "members' mutual roles and responsibilities," which included providing support for franchises, assisting franchises with any problems that arise, monitoring progress of franchises over time, supporting "overall Company growth and development," and exercising "good business judgment"; and (3) non-compete provisions, which barred any member from directly or indirectly "engag[ing] in or support[ing]" a business that competes or "intend[s] to compete" with Boomerang.[7]

---

[7] This may have been a material term. Under the Note, in addition to interest, Snowden was entitled to substantial profit-sharing distributions: 35% in the first year, 28% in the second year, 21% in the third year, 14% in the fourth year, and 7% in the fifth year.

Thus, in addition to its ability to meet its financial obligations as a member of Boomerang, Snowden had to prove its ability to comply with the non-financial obligations of Boomerang's members, including the non-compete provisions.

The record also reflects that during discovery, Snowden received, at a minimum: Boomerang's detailed general ledger—showing every accounting entry—from July 9, 2018 through October 2021; Boomerang's Franchise Disclosure Document; Boomerang's Tax Returns for 2018 through 2020; and documents related to loans taken out by Boomerang. In addition, the Founders' counsel represented to Snowden's counsel that they had produced all documents concerning Boomerang that Snowden had requested in discovery. So, if the trial record lacked evidence from which the court could determine those terms, that failure counts against Snowden, not the Founders.[8]

---

According to the Note, the profit-sharing payments were for "consideration of the non-compete provision set forth in the [Loan Agreement]." Under section 6.4 of the Loan Agreement, the non-compete obligations extended until three years after the loan was fully repaid. Perhaps the consideration was structured this way to avoid a *potential* argument that the Loan violated usury laws. But it's also possible that Snowden, which had four individual members, was perceived at the time the Loan was made as a potential competitive threat. Whether that was the case four years later, when Snowden sought admission to Boomerang, should have been an issue the court considered before granting specific performance. This underscores the importance for Snowden, as the party seeking specific performance, to have established its readiness, willingness, and ability to satisfy *all* terms, financial and *non*-financial.

[8] A brief comment on the circuit court's finding that Snowden was ready, willing, and able to meet its financial obligations. The court made this determination based on the loan repayments and profit distributions Snowden received from its loan to MIP. This was problematic for two reasons. *First*, the court did not determine how much money Snowden would have needed to meet its financial obligations as a member of Boomerang. *Second*, there was no evidence that Snowden still had those funds at the time of trial. Perhaps those

**IV**

In sum, Snowden established that the Founders breached the Investment Right as to Ashburn, but it failed to prove damages. Accordingly, as to Ashburn, Snowden is entitled to nominal damages. *See S & S Bldg. Corp. v. Fidelity Storage Corp.*, 270 Md. 184, 188-89 (1973). Snowden also proved that the Founders breached the Investment Right as to Boomerang, but it failed to prove an entitlement to the relief it ultimately chose to seek, specific performance, and did not request nominal damages as an alternative remedy for that breach. The judgment ordering specific performance as to Boomerang must therefore be reversed.

Accordingly,

(1) The judgment of the circuit court as to Count One shall be reversed;

(2) The judgment of the circuit court as to Count Two shall be reversed in part and vacated in part; Count Two shall be reversed as to the Boomerang breach and vacated as to the Ashburn breach and shall be remanded for the circuit court to enter judgment against Maryland Indoor Play, LLC, Bynia Reed, Chinnababu Gudapati, and Sangeetha Gudapati in the amount of One Dollar ($1.00) for nominal damages for the Ashburn breach; and

(3) The judgment for attorneys' fees, costs, and interest in the amount of $438,245.86 shall be vacated and revisited by the circuit court on remand in light of this opinion.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND VACATED**

---

funds had already been distributed to its members. Thus, the court's finding that Snowden had the financial wherewithal to invest was not supported by the evidence.

That said, the court's finding *does* show that the circuit court agreed with the premise that Snowden needed to be ready, willing, and able to meet its financial obligations as a member, and that merely being ready and available to receive the notice was not what the court had in mind when it granted specific performance.

**IN PART AND REVERSED IN PART, TO THE EXTENT INDICATED IN THIS OPINION, WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. RESPONDENT TO PAY COSTS.**